# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 13, 2010

## STATE OF TENNESSEE v. CHRISTOPHER FIELDER

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-03221     John T. Fowlkes, Jr., Judge**

---

**No. W2009-01663-CCA-R3-CD  - Filed August 22, 2011**

---

Defendant, Christopher Fielder, was indicted along with his co-defendants Korry Hernandez and John Karcher for the class A felonies of especially aggravated robbery and especially aggravated kidnapping of Jason Seitz.  Defendant proceeded to be tried by a Shelby County jury.  His co-defendants testified against him pursuant to negotiated plea agreements.  The jury found Defendant guilty as charged.  The trial court sentenced Defendant to serve twenty years for each of the Class A felony convictions, and ordered the sentences to be served concurrently with each other.  Defendant appeals, arguing that the evidence was insufficient to support his convictions and that the sentences are excessive because (1) the trial court improperly applied enhancement factors; (2) the trial court erroneously failed to apply appropriate mitigating factors; and (3) his sentences are excessive and disproportionate when compared with the sentences received by his co-defendants.  We find no error and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Paul K. Guibao and Matthew S. Lyons, Memphis, Tennessee (on appeal); and Robert Wilson Jones, District Public Defender; Glenda Adams, Assistant Public Defender; and Jennifer Johnson, Assistant Public Defender, Memphis, Tennessee (at trial), for the appellant, Christopher Fielder.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; Pamela Fleming, Assistant District Attorney General; and Garland Erguden, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

**I. Facts**

The victim, Jason Seitz, testified as follows. On December 28, 2007, Mr. Seitz went to Korry Hernandez's house in Memphis to sell cocaine to John Karcher a/k/a "Droopy." The sale occurred outside the house in Mr. Seitz's car and he left. Approximately two hours later, Mr. Karcher called the victim again and asked him to bring more cocaine. The victim returned in about thirty minutes and honked the horn to have Mr. Karcher come outside for the transaction. A woman came out and told the victim the men were gone but would return soon, and invited the victim to come inside. Since he had known Mr. Karcher for some time, the victim went inside and waited.

Soon, Mr. Karcher, Defendant, and Korry Hernandez arrived. They went into the kitchen. Mr. Hernandez stated he did not like the quality of the drugs previously brought, and wanted a "tax" for allowing Mr. Seitz to use Mr. Hernandez's scales for weighing the cocaine. In order to avoid further confrontation, Mr. Seitz tossed some cocaine down and started to leave the house. Defendant locked the door and blocked Mr. Seitz's access to the doorway. The victim made a statement to the effect of "what's going on" and was struck by an object in the back of his head. The victim went down on his knees, and all three of the other men "jumped" on him and commenced to repeatedly kick and hit him. As the assault continued to take place, the men threatened the victim, asked him where the rest of his money was, threatened to kill his family, and took all of his money in his pockets plus his car keys, drugs, wallet, identification, and his shoes. Despite the victim's pleas to stop, Defendant and the other two men continued the assault.

At Mr. Hernandez's instruction, Defendant brought an electric circular saw, referred to by the witnesses by a brand name, "Skil" saw, to Mr. Hernandez. While Mr. Karcher was on top of the victim on the floor, Defendant held down the victim's arm. Mr. Hernandez plugged the saw into an electrical outlet and turned it on. Mr. Hernandez then threatened to cut off the victim's hand. When the victim was able to pull his arm away from the saw, Mr. Hernandez threatened to cut the victim's face while holding the turned-on "Skil" saw near the victim's head.

By this time, the victim was bleeding profusely. Someone put a pillowcase over his head to keep the blood from spreading. This obstructed his vision, but the victim added that "[m]y eyeball had already popped out [of] the socket and my whole ocular bone was broke. I couldn't see anyway." With the pillowcase still on his head, the victim was taken outside and put into the back seat of his own vehicle, a 2004 Jaguar. Mr. Karcher restrained the victim in the car. The victim was then driven away. He complained that his ribs were broken

and he could not breathe. Mr. Karcher continued to hit the victim on the head and told the victim he was "about to die." Eventually, the car stopped and the victim was thrown out. The victim stated he could hear all three men talking. He was kicked and hit some more after being thrown from his car, and then his car was driven away. The victim went to a house and "banged" on the door and told the woman there to call an ambulance. The victim laid on the porch until the ambulance arrived and took him to Methodist Hospital North where he was treated for his injuries.

The victim testified that as a result of the attack upon him by Defendant, Mr. Hernandez, and Mr. Karcher, he received twenty-two staples in his head, he had a dislocated jaw, a broken ocular bone, (his eye actually "came out"), a broken rib, and he passed blood in his urine for approximately one month. Regarding pain, the victim said that for the first week after the incident, he was confined to the couch; "everything" was sore - his head, chest, neck, back, ribs, and he also hurt internally.

Because Defendant and the co-defendants threatened the victim and his family, and because the victim was scared that he might be prosecuted for selling drugs, he initially lied to police officers about how he was injured. When confronted by officers that his story did not "add up," the victim then told the truth. He identified Defendant and the co-defendants from photograph line-ups presented to him, and identified Defendant at trial.

Heather Bierbrodt, keeper of the patient records for Methodist Hospitals in Memphis, brought a copy of the victim's medical records which was made an exhibit at trial. She testified, concerning injuries noted in the records, that the victim had a contusion of the face, an orbital fracture, a laceration to his scalp, and a contusion to his scalp.

Officer Tyont Shabazz of the Memphis Police Department testified that he and his partner pulled over, and then chased, two individuals who were in the victim's Jaguar vehicle on the night of December 28, 2007. After receiving a dispatched broadcast of the stolen vehicle and general direction it was believed to be traveling, Officer Shabazz parked and waited. They saw the vehicle, pulled in behind it, and confirmed through the license plate number that it was the vehicle reported as stolen. They turned on the blue lights and the Jaguar, with two occupants, came to a stop. However, just after Officer Shabazz exited his patrol car, the Jaguar took off. An ensuing chase resulted in the Jaguar wrecking through a fence at an apartment complex. The two occupants, including Defendant, ran off in different directions. The officers gave chase and momentarily lost sight of Defendant, but ultimately found him out of breath in a stairwell to a basement door at a church. Defendant was taken into custody. No money or drugs were found in Defendant's possession.

John Karcher, one of the co-defendants, testified that he was guilty of especially aggravated robbery and especially aggravated kidnapping of the victim. Mr. Karcher stated that he had accepted an effective sentence of "13.5 years at 100%" for his truthful testimony in Defendant's trial. Mr. Karcher had known the victim for about a year prior to the crimes, and had previously bought cocaine from the victim. Mr. Karcher called the victim both times on the day of the incident. After the victim came inside the house on his second trip there to sell cocaine, Defendant and Mr. Hernandez returned to the house. The victim and Mr. Hernandez went into the kitchen. They were arguing about the cocaine previously supplied and Mr. Hernandez said he wanted the victim to pay a "tax" on the use of Mr. Hernandez's scales. The victim threw a bag of cocaine and started to leave. Defendant then locked the door and Mr. Hernandez hit the victim in the back of his head. All three men then started punching and kicking the victim while he was down on the floor.

Defendant took money and keys out of the victim's pockets. Mr. Hernandez grabbed a "circular saw" and instructed Defendant to hold down the victim's hand. Mr. Hernandez turned on the electric saw and held it in a threatening manner toward the victim. Someone put a pillowcase over the victim's head and placed the victim into the back seat of his car. Mr. Karcher and Mr. Hernandez left with the victim in the victim's car. Defendant followed as a passenger in a car driven by Mr. Hernandez's sister, who was also at the house. Mr. Hernandez was driving the victim's car and Mr. Karcher was in the back seat with the victim. After driving for a while, they stopped and put the victim out of his vehicle. Then Defendant and Mr. Karcher swapped vehicles they were riding in, so that Defendant left as a passenger in the victim's vehicle. Mr. Karcher stated that he saw "a lot of [the victim's] blood" on the floor at the house. He reiterated that all three men were kicking and punching the victim at the house.

The other co-defendant, Korry Hernandez, also testified under the same plea agreement terms and conditions as Mr. Karcher. Mr. Hernandez also admitted that he was guilty of the crimes. Mr. Hernandez's testimony was very similar to the testimony by Mr. Karcher. Mr. Hernandez admitted hitting the victim in the back of the head with brass knuckles after the victim pushed Defendant when Defendant had locked the door and was blocking the victim's access to the door. Mr. Hernandez confirmed that all three men were kicking and punching the victim while he was down on the floor. He stated that there was a lot of blood on the floor and he got a towel to clean it up. Mr. Hernandez admitted that he turned on the electric Skil saw to frighten and threaten the victim while Mr. Karcher lay on top of the victim and Defendant stepped on the victim's hand to hold it down. Mr. Hernandez acknowledged that they took the victim's money, cocaine, keys, and his cell phone. Mr. Hernandez also confirmed the other witnesses' testimony about taking the victim away, putting him out of his car, leaving in the car, the police chase, and the wreck.

John Poindexter, an officer with the Memphis Police Department, testified that he was the case investigator in the victim's case. In the course of the investigation, he interviewed the victim. In particular regard to the victim's injuries, Officer Poindexter testified that when the victim had to sneeze, he covered his injured eye because the medical staff had advised him that the action of sneezing could cause his eye to come out again. He also observed that the victim had "twenty-four [sic] staples that closed the wounds to his jaw which was also dislocated below his left eye." Officer Poindexter stated that the victim picked out Defendant and the co-defendants from three separate photo line-ups (one for each perpetrator). He also interviewed Defendant and took a written statement from him. Defendant admitted in the statement that he was present when the victim was robbed and kidnapped, but denied any involvement in the incident. In Defendant's words, "I witnessed it, but I didn't participate." Defendant did not mention Mr. Hernandez in his statement to police. Defendant told police that "Droopy" (Mr. Karcher) was the only person who hit the victim. Defendant stated that Mr. Karcher hit the victim in the back of his head with brass knuckles, and also kicked him a few times. Defendant stated that Mr. Karcher took the stuff out of the victim's pockets, put a pillowcase over the victim's head and shoved the victim into the back seat of the victim's car, and drove off. He told the police about getting into the victim's vehicle after the victim had already been tossed out, the police chase, and being apprehended by the police. Defendant acknowledged that at the house, "[a]t one point I was standing in front of the door. I think I checked to see if it was locked and natural instinct to block it so the guy [the victim] couldn't get out."

The State rested its case at the conclusion of Officer Poindexter's testimony. Defendant testified in his defense as follows. He was at Korry Hernandez's house on the day the victim was robbed. Defendant had been there since spending the previous night at the house. Also present was Mr. Hernandez, Mr. Hernandez's sister, and Mr. Karcher. They had been "partying," consuming beer, whiskey, marijuana, and cocaine. Defendant had known Mr. Hernandez for quite a few years, and had met Mr. Karcher a week or so before the incident involving the victim. The victim brought cocaine, left, and some time later was called and asked to bring more cocaine. Defendant was temporarily away from the house when the victim came the second time. He locked the door because there was "drugs in the house." He heard Mr. Hernandez and the victim arguing. Defendant testified that he walked to the front door as the victim was headed toward the door. Defendant stated that he was planning to unlock the door for the victim, but the victim became aggressive and pushed Defendant. Mr. Hernandez then came running toward the victim. The victim hit the ground, and Mr. Karcher and Mr. Hernandez kicked and beat the victim. Defendant added that "I don't remember exactly whether I physically beat him or not." Defendant did not deny beating the victim, and he did acknowledge that he "might" have beat the victim.

Defendant admitted in his testimony that he stepped on the victim's hand while the Skil saw was being used. Defendant denied taking any property from the victim. Defendant confirmed that the victim was placed into the back seat of his own car, and Mr. Karcher also got into the back seat and Mr. Hernandez drove the victim's car. Mr. Hernandez told his sister to follow them. Defendant testified that he got into the car with Mr. Hernandez's sister because "[i]t's not really my house. I wasn't really supposed to stay there. I suppose I could have taken off walking or something."

Defendant described how Mr. Karcher dropped the victim out of the victim's car and then the car was driven away with only Mr. Hernandez and Mr. Karcher inside. The two vehicles went to a gas station, and Defendant got into the victim's car along with Mr. Hernandez, and Mr. Karcher got into the other vehicle. He then testified that he did not tell the police about Mr. Hernandez's involvement in his (Defendant's) statement to the police because the police did not already know about Mr. Hernandez being involved. During cross-examination, Defendant admitted the he had made sure the front door of the house was locked and stood at the door to make sure the victim could not escape. Defendant also admitted holding down the victim's hand so Mr. Hernandez "could scare him" with the Skil saw. Defendant confirmed that money (at least $100.00), keys, and "maybe" a cell phone were taken from the victim.

## II. Analysis

### A. Sufficiency of the Evidence

Although phrased as trial court error by failing to grant a motion for judgment of acquittal, Defendant in essence challenges in his first two issues the legal sufficiency of the evidence to support his convictions for especially aggravated robbery and especially aggravated kidnapping. Defendant chose to present evidence in his defense, and therefore has waived the right to specifically appeal the denial of his motion for judgment of acquittal. *Finch v. State*, 226 S.W.3d 307, 317 (Tenn. 2007); *State v. Mathis*, 590 S.W.2d 449, 453 (Tenn. 1979). However, this does not affect Defendant's ability to challenge the sufficiency of the evidence on appeal – it does, however, mandate that *all* of the evidence at trial is considered, not just the evidence introduced up to the close of the State's case-in-chief. Specifically, as to the especially aggravated robbery conviction, Defendant asserts:

(i)     There was insufficient evidence that the victim suffered "serious bodily injury;" and

(ii)    There was no proof that Defendant used or displayed any of the weapons allegedly used in the incident.

Specifically as to the especially aggravated kidnapping conviction, Defendant asserts:

(i)     there was insufficient evidence that the victim suffered "serious bodily injury;" and

(ii)    there was insufficient evidence that Defendant participated in the kidnapping of the victim.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. *See State v. Evans*, 108 S.W.3d 231, 237 (Tenn. 2003); *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *See Carruthers*, 35 S.W.3d at 558; *Hall*, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. *See Evans*, 108 S.W.3d at 236; *Bland*, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. *See Evans*, 108 S.W.3d at 236-37; *Carruthers*, 35 S.W.3d at 557.

The elements of especially aggravated robbery are:

(1)     Robbery as defined in Tennessee Code Annotated section 39-13-401;

(2)     Accomplished with a deadly weapon; and

(3)     Where the victim suffers serious bodily injury.

T.C.A. § 39-13-403

Robbery is defined in Tennessee Code Annotated section 39-13-401 as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear."

As charged in the indictment, the elements of especially aggravated kidnapping are:

(1)     false imprisonment as defined in Tennessee Code Annotated section 39-13-302,

(2)     where the victim suffers serious bodily injury.

T.C.A. § 39-13-305(a)(4)

Tennessee Code Annotated section 39-13-302 defines false imprisonment as follows: "(a) A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty."

A "deadly weapon" is defined as "[a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury" or "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." T.C.A. § 39-11-106(a)(5)(A) and (B).

Our legislature has stated that "'[b]odily injury' includes a cut, abrasion, bruise, burn, or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." T.C.A. § 39-11-106(a)(2). Relevant to the time of the incident here, the General Assembly limited the injuries to victims which can be classified as "serious bodily injury" to those examples of bodily injury defined in Tennessee Code Annotated section 39-11-106(a)(2) which involve:

(A)    A substantial risk of death;
(B)    Protracted unconsciousness;
(C)    Extreme physical pain;
(D)    Protracted or obvious disfigurement;
(E)    Protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty; or

T.C.A. § 39-11-106(a)(34)(A)-(E) (2006)

We will first address Defendant's argument that the State failed to prove that the victim suffered "serious bodily injury," an essential element of both especially aggravated robbery and especially aggravated kidnapping. Defendant relies upon this Court's decision in *State v. Sims*, 909 S.W.2d 46 (Tenn. Crim. App. 1995) to support his argument that the State failed to prove that the victim's bodily injury was "serious bodily injury." In *Sims* the defendant appealed his conviction for especially aggravated robbery. He challenged the sufficiency of the evidence to support his conviction. Specifically, the defendant argued that the State failed to prove that the victim sustained "serious bodily injury." The proof at trial was that the victim was the hostess and cashier at an International House of Pancakes restaurant in Nashville. The defendant bought a cup of coffee and then requested change for a dollar after the victim had closed the cash register. When the victim opened the cash drawer to make change, the defendant put his left had into the cash drawer. The victim closed the drawer and held it shut with both hands. The defendant pulled out a gun and pointed it at the victim's face. She jumped back. Defendant stated that he struck the victim and the gun accidently discharged. The victim testified that she was not sure whether she was struck in the face by the bullet or by the gun. In any event, she fell to the floor and the defendant emptied the cash drawer, took the money, and left the restaurant. The victim was treated at Vanderbilt Hospital. She suffered a bruised cheekbone and a broken nose. *Sims*, 909 S.W.2d at 47-48.

The victim testified that on the day after the incident, her nose was swollen and her eyes were "black and blue." She had a laceration on the bridge of her nose, and she saw a plastic surgeon twice but never received plastic surgery. She testified that her two bottom front teeth began to hurt "a few days after" the incident. A dentist removed those teeth and she had a partial plate at the time of the trial. The dentist did not testify at trial. The victim testified that she missed five weeks of work and "experienced extreme physical pain over her whole face, but especially to her nose." *Id*. at 48.

A paramedic who treated the victim testified that the victim's blood pressure, heart rate, and pulse rate were normal and that she was alert, oriented, and that she had not been unconscious. *Id*. at 49. The physician who treated the victim at the hospital testified that she came to the emergency room with a small laceration on the bridge of her nose and with "significant" swelling and bruising, indicating a fractured nose. He concluded that the victim had not suffered a bullet injury. She was in the emergency room almost two hours before being discharged.

This court determined that the State had failed to prove beyond a reasonable doubt that the victim had suffered serious bodily injury as a result of the defendant's criminal acts, and modified the conviction to aggravated robbery. After quoting the definition of "serious

bodily injury" set forth in Tennessee Code Annotated section 39-11-106(a)(33), this court in *Sims* stated as follows:

> The *ejusdem generis* canon of statutory construction is helpful when construing the enumerated definition of "serious bodily injury." According to the Sixth Edition of Black's Law Dictionary, *ejusdem generis* means when words follow an enumeration of classes of things the words should be construed to apply to things of the same general class as those enumerated.[ ] Therefore, the enumerated portions of the definition of serious bodily injury should be read as coming from the same class of injuries. We do not believe that the pain commonly associated with a broken nose is extreme enough to be in the same class as an injury which involves a substantial risk of death, protracted unconsciousness, protracted or permanent disfigurement or the loss or impairment of the use of a bodily member, organ or mental faculty. We admit to the difficulty of quantifying or measuring pain.

*Id*. at 49.

The *Sims* court concluded that since the dentist did not testify, and the emergency room doctor who did testify stated that the victim had no evidence of loose teeth or blood in her mouth, and that he would be surprised if the incident caused her teeth to be extracted, then there was not proof beyond a reasonable doubt of "protracted disfigurement" caused by the criminal incident. *Id*. at 49-50.

In the case *sub judice*, the victim testified that as a result of the criminal incident, he received twenty-two staples in his head, he had a dislocated jaw and a broken ocular bone, a broken rib, and he passed blood in his urine for about one month. The victim's medical records were admitted as an exhibit. The keeper of the records testified that the records included notations that the victim had contusions of his face and scalp, a laceration of his scalp, and an orbital fracture. In addition, the diagnosis of the attending physician reflects that the victim had an abrasion of the face, contusions on the face, nose, and abdominal wall, a concussion with brief loss of consciousness, left orbital floor fracture, abdominal pain, and right parietal scalp laceration. The medical records also confirmed the use of staples to close the scalp lacerations. The victim also testified that it took him five months to completely recover from his injuries, and he described the pain he suffered as follows: "The first week I couldn't move. My mom had to help me with everything I did. I couldn't even get off the couch. Everything was sore. I couldn't move."

Specifically, the victim listed the following parts of his body that hurt: ribs, chest, back, neck, head, and internal organs. In light of the very limiting definition of "serious

bodily injury" set forth by the General Assembly, and this court's analysis in *Sims*, the case *sub judice* is close on the issue of sufficient proof of "serious bodily injury."

Examining the statutory definition of "serious bodily injury," we note that the proof at trial was void of evidence that the bodily injury sustained by the victim involved a substantial risk of death. There was likewise, no proof that any of the bodily injuries suffered by the victim caused *protracted* unconsciousness or *protracted* loss or *substantial impairment* of a function of a bodily member, organ, or mental faculty. The victim did testify that his eye "popped out" of its socket when his "whole ocular bone was broke [sic]." He also testified that over twenty staples were required to close lacerations in his head. However, there was no testimony or other evidence that the victim's vision was impaired by injury except for the period of time while the pillowcase was over his head, and the victim never mentioned any scarring, or showed scars to the jury. No photographs of the victim taken after the incident to show the extent of his injuries were introduced at trial. Thus, there also was a void of evidence that the bodily injuries caused protracted or obvious disfigurement.

The issue depends upon whether the physical pain resulting from the victim's bodily injury was sufficiently "extreme" to constitute "serious bodily injury." In *Sims*, this court stated that pursuant to the *ejusdem generis* canon of statutory construction, "[w]e do not believe that the pain commonly associated with a broken nose is extreme enough to be in the same class as an injury which involves a substantial risk of death, protracted unconsciousness, protracted or permanent disfigurement or the loss or impairment of the use of a bodily member, organ or mental faculty." *Sims*, 909 S.W.2d at 49.

However, we conclude that the total pain from the combined bodily injuries of (1) lacerations of the head sufficient to require over twenty staples and caused in part by kicks and being hit with brass knuckles; (2) a broken ocular bone and fractured rib; (3) contusions to the face, nose, and abdominal wall; (4) abdominal pain; and (5) a concussion with a brief loss of consciousness, along with the testimony of the victim establishing the extent of his pain for a week following the incident, suffices to be "extreme" enough to constitute serious bodily injury. Defendant is not entitled to relief in this particular challenge to the sufficiency of the evidence.

Defendant also challenges his conviction for especially aggravated robbery by arguing that the state failed to prove that he ever used a weapon during the incident. He also asserts that the State did not prove he participated in the theft of property from the victim, stating in his brief, "[i]t is undisputed that [Defendant] never took possession of any items removed from the victim's pockets and did not ever exercise control over the victim's car." Defendant does not contest the sufficiency of the evidence that deadly weapons (brass knuckles and the

running Skil saw in the manner of its use) were used to accomplish a robbery of the victim. He also asserts that his conviction for especially aggravated kidnapping must be reversed because there was legally insufficient evidence that he participated in any kidnapping or false imprisonment of the victim.

Taking the evidence in the light most favorable to the State, as we are required to do, the proof was that Defendant locked the door to the house and blocked the victim's access to the door at the beginning of the especially aggravated robbery. Defendant removed money and other items from the victim's pockets while all three perpetrators were kicking and hitting the victim who was on the floor. The victim was forced into the back seat of his own vehicle. Defendant left the house in the car following the victim's vehicle, which had been taken by the co-defendants with the victim forced inside with a pillowcase over his head. Defendant became a passenger in the victim's car shortly after the victim was "dumped" from the vehicle and abandoned. While the victim was being beaten and threatened at the house, Defendant held down the victim's arm while the Skil saw was turned on and used in a threatening manner.

Tennessee Code Annotated section 39-11-401(a) provides:

(a) A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both.

As applicable to the case *sub judice*, Tennessee Code Annotated section 39-11-402 provides in part as follows:

A person is criminally responsible for an offense committed by the conduct of another if:

* * *

(2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense;

* * *

T.C.A. § 39-11-402(2)

There was overwhelming proof presented at trial that Defendant participated by his own conduct and also that Defendant was criminally responsible for the conduct of his co-defendants. Defendant's arguments rely primarily on interpretations of the evidence in a light most favorable to him, rather than the State, and his assertions that his co-defendants'

testimony was not credible. As noted above, we must view the evidence in a light most favorable to the State, *Carruthers*, 35 S.W.3d at 558; *Tuggle*, 639 S.W.2d at 914; also, the jury's verdict of guilt accredits the testimony of the State's witnesses and resolves all conflicts in the testimony in favor of the State. *Bland*, 958 S.W.2d at 659.

Defendant is not entitled to relief on his challenges to the sufficiency of the evidence to support his convictions.

## B. Sentencing

Defendant's convictions were for two Class A felonies. The trial court correctly determined that Defendant must be sentenced within Range I, which for a Class A felony is fifteen to twenty-five years. T.C.A. § 40-35-112(a)(1).

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. *See* Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Comments; *see also State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999); *see also State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008). If our review reflects that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991); *see also Carter*, 254 S.W.3d at 344-45.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b); *see also Carter*, 254 S.W.3d at 343*; State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002).

The Defendant's conduct occurred subsequent to the enactment of the 2005 amendments to the Sentencing Act, which became effective June 7, 2005. The amended statute no longer imposes a presumptive sentence. *Carter*, 254 S.W.3d at 343. As further explained by our supreme court in *Carter*,

> the trial court is free to select any sentence within the applicable range so long as the length of the sentence is "consistent with the purposes and principles of [the Sentencing Act]." [Tenn. Code Ann.] § 40-35-210(d). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," [Tenn. Code Ann.] § 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," [Tenn. Code Ann.] § 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," [Tenn. Code Ann.] § 40-35-103(5).

*Id*. (footnote omitted).

The 2005 Amendment to the Sentencing Act deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered these factors merely advisory, as opposed to binding, upon the trial court's sentencing decision. *Id*. Under current sentencing law, the trial court is nonetheless required to "consider" an advisory sentencing guideline that is relevant to the sentencing determination, including the application of enhancing and mitigating factors. *Id*. at 344. The trial court's weighing of various mitigating and enhancing factors is now left to the trial court's sound discretion. *Id*. Thus, the 2005 revision to Tennessee Code Annotated section 40-35-210 increases the amount of discretion a trial court exercises when imposing a sentencing term. *Id*. at 344.

To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. *See id.* at 343; *State v. Samuels*, 44 S.W.3d 489, 492 (Tenn. 2001). If our review reflects that the trial court applied inappropriate mitigating and/or enhancement factors or otherwise failed to follow the Sentencing Act, the presumption of correctness fails and our review is de novo. *Carter*, 254 S.W.3d at 345.

Defendant asserts that the trial court erred by imposing a sentence of twenty years for each conviction. He argues that the trial court should not have set either sentence above the statutory minimum of fifteen years. In support of this argument Defendant states that the

statutory enhancement factors applied by the trial court are inappropriate and not applicable in his cases.

The trial court applied to both convictions the enhancement factor that Defendant "treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense." T.C.A. § 40-35-114(5). The trial court applied to the especially aggravated kidnapping conviction that Defendant "possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense." T.C.A. § 40-35-114(9). Defendant argues that his co-defendants used the deadly weapons and there was no proof that Defendant utilized or possessed any deadly weapon. Likewise, he asserts that the factors cited by the trial court as constituting "exceptional cruelty" were the acts of only his co-defendants. In support of his argument, Defendant relies upon *State v. Ronald Eugene Hall and Henry Lee Dixon*, No. M2003-02326-CCA-R3-CD, 2005 WL 292432 (Tenn. Crim. App. Feb. 8, 2005), *no perm. app. filed*. In *Hall and Dixon*, the defendant Hall was convicted of second degree murder and the defendant Dixon was convicted of facilitation of second degree murder in the same case. *Id.* at *1. In sentencing Dixon, the trial court applied the enhancement factor that Dixon had possessed or employed a firearm in the commission of the felony. *Id.* at *13. The victim was shot to death by defendant Hall, while he was in a parked vehicle operated by someone else, and defendant Dixon, while facilitating the crime, was not present when the victim was shot. *Id.* at *3-4.

This court in *Hall and Dixon*, addressing the applicability of the statutory enhancement factor based upon a defendant's possession or employment of a firearm, stated that this enhancement factor:

> requires a finding that the defendant possessed or employed a firearm during the commission of the offense. Although it is clear that Defendant Hall employed a firearm during the commission of the offense, there is no evidence in the record to support a finding that Defendant Dixon was armed. We cannot conclude that this enhancement factor can be applied vicariously under the facts presented. While the evidence is sufficient to support Defendant Dixon's conviction of facilitation of second degree murder, it cannot be said that he "possessed or employed a firearm" during the commission of his offense. [citations omitted]

*Id.* at *14

In its brief the State has failed to specifically address Defendant's reliance on *Hall and Dixon*; the State instead asserts that the two enhancement factors applied by the trial court are "clearly applicable" and argues the following:

Given the nature of the new sentencing act, the trial court had the discretion to impose sentences anywhere in the applicable ranges. *See* T.C.A. § 40-35-210(c)(2). Based on all of the sentencing considerations, including the advisory enhancement factors, the trial court determined that the sentence imposed was warranted for each of the defendant's convictions. Such a determination was within the trial court's discretion under the new sentencing act. Therefore, the trial court abided by the new sentencing guidelines and did not abuse its discretion, and the defendant is entitled to no relief from his sentences.

Defendant's argument is straightforward, clear, and unambiguous, and he relies upon case law of this Court which addresses analogous facts to Defendant's case. In *Hall and Dixon*, Defendant Hall shot the victim and the proof clearly showed that Defendant Dixon never possessed or employed a firearm, and therefore, the subject enhancement factor was not applicable. In Defendant's case, one co-defendant operated the Skil saw, and another co-defendant used the brass knuckles. Defendant did not operate the Skil saw or use or possess the brass knuckles. The trial court also made a finding that the three perpetrators, including Defendant, kicked the victim with boots that made these boots "deadly weapons." Defendant argues in his brief that there is nothing in the record that states what kind of footwear Defendant was wearing. The State has also chosen to ignore this assertion by Defendant and we have not found any evidence that Defendant wore boots. Thus, we accept Defendant's argument that the trial court erred by finding that boots were employed by Defendant as a deadly weapon.

However, we do distinguish *Hall and Dixon* from Defendant's case. The proof showed that Defendant picked up the Skil saw and handed it to his co-defendant, so that it could be used as a deadly weapon. Accordingly, Defendant at the very least "possessed" a device used as a deadly weapon during the perpetration of the offenses. Use of a deadly weapon is an essential element of especially aggravated robbery, and the trial court properly declined to apply enhancement factor (9) to that offense. *See* T.C.A. § 40-35-114. There is no error in applying this enhancement factor to the sentence for especially aggravated kidnapping.

Defendant also asserts that the trial court erred applying enhancement factor (5) for two reasons:

(1) The facts found by the trial court to constitute exceptional cruelty were "focused on the perceived extent of the injuries sustained by the victim rather than on the specific cruel actions of [Defendant]; and

(2) The actions cited by the trial court that were exceptionally cruel were not attributable to Defendant.

Among the facts found by the trial court to constitute exceptional cruelty to the victim was the manner of use of the Skil saw to threaten amputation of the victim's hand and cutting his face, and the threats to the lives of the victim's family. This mental torture was clearly beyond the elements of the offenses. In addition, the enhancement factor states that "[t]he defendant treated, or *allowed a victim to be treated*, with exceptional cruelty during the commission of the offense." T.C.A. § 40-35-114(5) (emphasis added). The proof showed that Defendant immobilized the victim's hand while the Skil saw was operated in the threatening manner it was used. Furthermore, the proof supports the inference that Defendant allowed the victim to be frightened by serious threats to his life and the lives of his family.

As to mitigation, Defendant argues that the trial court erred by not applying any of the statutory mitigating factors in Tennessee Code Annotated section 40-35-113. We have examined the record in light of Defendant's argument and conclude that the trial court did not err by not applying any mitigating factors. In addition, Defendant asserts that the trial court should have reduced the sentence for especially aggravated kidnapping pursuant to the following mitigation consideration in the statute defining especially aggravated kidnapping: "[i]f the offender voluntarily releases the victim alive or voluntarily provides information leading to the victim's safe release, such actions shall be considered by the court as a mitigating factor at the time of sentencing." T.C.A. § 39-13-305(b)(2). We do not feel that forcing a severely injured victim into the back of his own vehicle with a pillowcase over his head, and continuing to beat him until arrival at a destination where he is "tossed" from the vehicle and left alone, without a vehicle, meets the statutory definition of voluntary release of the victim.

Finally, Defendant argues that his total effective sentence of twenty years is excessive because it is disproportionate to the sentences of 13.5 years received by each co-defendant pursuant to negotiated plea agreements. Defendant argues that his co-defendants were the leaders in the crimes and were much more culpable then Defendant. Defendant does not cite to any part of the Sentencing Act in support of his argument and admits that "there [does] not appear to be any Tennessee cases directly relevant to this issue." Defendant does rely upon the case of *Berthoff v. U.S.*, 140 F. Supp. 2d 50 (Mass. 2001) in support of his argument that he was punished for exercising his right to trial by jury. We are not persuaded by the reasoning of the federal district court in *Berthoff*. Defendant is not entitled to relief on his sentencing issue.

**CONCLUSION**

After a thorough review of the record and briefs of the parties, we affirm the judgments of the trial court.

_____

THOMAS T. WOODALL, JUDGE