James Nathaniel MATHIS, Petitioner,

v.

STATE of Tennessee, Respondent.

Supreme Court of Tennessee.

Dec. 3, 1979.

Wm. Walker Gwinn, Memphis, for petitioner.

Brooks McLemore, Jr., Atty. Gen., John F. Southworth, Jr., Asst. Atty. Gen., Nashville, Hugh W. Stanton, Jr., Dist. Atty. Gen., David C. Wade, Don A. Dino, Asst. Dist. Attys. Gen., Memphis, for respondent.

## OPINION

HENRY, Justice.

We granted certiorari in this criminal action, wherein petitioner was convicted of murder in the second degree and sentenced to thirty-two years confinement in the state penitentiary, in order to determine the sufficiency of the evidence. We find it to be insufficient and reverse and dismiss the case.

Petitioner was jointly indicted and tried with Bobby B. Kimmons, also known as "Skinny Pimp," who received the same sentence. The homicide was actually committed by Kimmons. We denied certiorari in his case because our review of the evidence resulted in our considering it to be sufficient. The conviction of petitioner must rest upon the sufficiency of the evidence to convict him as an aider and abettor.

## I.

### Factual Background

The State's case against petitioner rests solely upon the insistence that he handed Kimmons the gun used to commit the homicide. We review the evidence and trial proceedings.

#### a. General Factual Background

Late at night on November 13, 1976, Kimmons, accompanied by petitioner, Terry (Doc) Williams and James (Butch) Gregory, went to the apartment of the victim, Ronald (Shine) Farmer, apparently for the purpose of borrowing his automobile. With Farmer were James Anthony and Fred Jeffries. Only Kimmons and petitioner entered the apartment. Kimmons got into an argument with Farmer stemming from damages done to his automobile on an occasion when he previously used it. Petitioner left, went to his house and later came back. Upon his return the argument had moved outside. It concluded when Kimmons shot and killed Farmer.

#### b. State's Proof

The State led off with James Anthony, who was in Farmer's apartment when petitioner and Kimmons arrived. Anthony was a senior at Booker T. Washington High School. According to him, Kimmons entered alone and talked with Farmer about

borrowing his car. Farmer demurred because of damage done when he had borrowed it before. During this discussion, petitioner entered, spoke and went back out—after staying only a minute or two. After he left, Farmer and Kimmons went out into the hallway and continued the argument in rather heated tones and terms. Anthony and Jeffries went out into the hall, brought Farmer back inside and threw him on the bed.

Subsequently, Farmer, Anthony and Jeffries went out to the car. As they did they came upon Kimmons who started arguing again. Anthony's statement of the critical events follows:

As Shine was getting in the car, me and Fred had already got in the car, and Shine got back out of the car, and went around the car, and they was start (sic) arguing. And, *I saw Bobby* [Kimmons] *bend over.* I don't know exactly what he was bending over for, but they were arguing, and he came around. When he came around, I saw the gun in his hand. And, *I tried to tell Mr. Farmer that he had a gun* so he would come on and get in the car, so we could go where he was going. And, so they kept on arguing, and Shine was in a swing on Mr. Bobby, and Bobby pushed him back off of him, and shot him. (Emphasis supplied).

He stated positively that he did not see petitioner; that he didn't know where he was; and that he never saw petitioner after he left the apartment.

The State's next witness was Fred Lee Jeffries. He was in Farmer's apartment when Kimmons arrived. He corroborates Anthony on the beginning conversation, the subsequent entry of petitioner, his departure, and generally on the details of the argument in the apartment and hallway and their taking Farmer back into the apartment to "cool him down."

He says that after they left the apartment and as they were going to the car, Kimmons appeared in the hallway and porch and started provoking Farmer. His version of the shooting coincides with Anthony's in the essential details. The following extracts from his testimony on the State's direct examination are significant:

Q. Could you tell whether Bobby Kimmons, Skinny Pimp, had a weapon?

A. Well, before he got up on him, *I seen him bend down, and brought something out.*

&ast; &ast; &ast; &ast; &ast; &ast;

Q. Did you see anyone else around that time?

A. No.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. When you saw that [the shooting] was the defendant, James Mathis, standing close by him.

A. No.

At this point the State requested a jury-out hearing. In the absence of the jury, the witness was examined about an alleged statement made by him to the examining Assistant District Attorney General to the effect that petitioner was standing near Skinny Pimp when the shot was fired. It was the witness' insistence that he was referring to the hallway and not the outdoor area at the time of the killing. He maintained that he had been asked by the Assistant District Attorney General whether petitioner was "anywhere around when they were arguing." His response to that inquiry had been in the affirmative.

The witness reiterated that he had not seen petitioner at the time of the shooting but, by affirmative response, said he "saw him just before the shooting." He gave certain distance estimates between petitioner and Mathis but these were clearly during the argument that preceded the shooting.

The jury was returned to the courtroom. Jeffries again stated that he had been an eyewitness to the shooting but did not see petitioner "out there," and that he "was not outside." The jury was again excused. The Trial Judge immediately took over the questioning of the witness and examined and cross-examined him rigidly and closely. The witness reiterated that petitioner was not present at the time of the shooting.

It is apparent from the Trial Judge's questions that he construed the witness' testimony during the jury-out hearing as outlining the distance separating petitioner from Kimmons as relating to the time of the actual shooting. It is equally apparent that the witness had, in fact, related it to the time of the prior argument.

After the Trial Judge had admonished the witness that "if you tell a lie on this witness chair, under oath, about this case, you can go to the penitentiary for perjury," Jeffries again stated that petitioner was not outside and that he last saw him "when they was arguing in the hall." The court graciously acknowledged that perhaps there had been a misunderstanding.

Be these things as they may, it was his clear and unrefuted testimony that the last time he saw petitioner was during the argument in the hall and he saw him at no other time that night. There was no proof to the contrary and we cannot presume the falsity of his statements, absent competent contradictory proof.

On cross-examination by Kimmons' counsel the witness stated that Kimmons took the pistol out of his sock. Before the actual shooting, he warned Farmer that Kimmons had a gun.

The next and last eyewitness called by the State was Tony Williams, who had accompanied petitioner and Kimmons to the Farmer apartment.[1] Upon arrival he remained in the car while Kimmons and petitioner went inside. Subsequently, petitioner came out alone, got in the automobile, drove to his house, got out, went inside and then came out. He had nothing in his hands. They drove back to Farmer's apartment. Petitioner got out but he "didn't pay no more attention to him." The witness remained in the car.

While seated in the car, he saw Farmer and Kimmons and heard them arguing. He saw Farmer advance on Kimmons and heard the shot. At the time Mathis was standing on the other side of a tree but not near Kimmons. He did not see Mathis hand Kimmons anything. As a matter of fact, he did not see the gun.

The State's last witness was Sergeant Kenneth East of the homicide division of the Memphis Police Department. On the night of the murder, as a part of his investigation, but before the investigation had focused on him, he talked with Mathis. Mathis related that he did not see the murder but heard the shot fired. He "didn't have any idea" how Kimmons got the weapon.

■ This was the State's entire case against petitioner. The State had established that Kimmons shot and killed Farmer. It had proved by two eyewitnesses that petitioner was not even at the scene, and by a third that he had gotten out of a car upon his return to the scene and apparently was somewhere in the vicinity. However, the State did not establish, by that third witness, that petitioner even witnessed the shooting. It had presented witnesses who said Kimmons bent down and removed the gun from his sock. The State's witnesses had affirmatively stated that petitioner did not hand a gun to Kimmons. In short, the State did not prove that petitioner was a participant who had committed, or aided or abetted in the commission of, any crime.

### c. *Motion for Directed Verdict*

At the conclusion of the State's proof the petitioner moved the court for a directed verdict.

During the course of the argument the State conceded that there was only "slim proof against Mr. Mathis." It only argued a statement allegedly made by Tony Williams that petitioner had told him he had handed Kimmons the gun. It should be noted that Williams admitted to having made this statement to the police after they had represented to him that petitioner had "done this here." On the stand he flatly denied that petitioner had given Kimmons a

---

1. They were also accompanied by James Gregory, a female impersonator, who did not testify. Apparently neither side had been able to locate

him. The criminal investigator had made an unsuccessful effort to do so.

gun and attributed his statement to confusion and a fear that he was being considered a suspect. He was eighteen years old at the time of the trial. Moreover, the court correctly held this not to be substantive evidence.

The State, in argument, did not dwell on this act at any length. In fact, the State's entire argument on the petitioner's motion is covered in twenty-one lines of the transcript and concludes with the commendably candid statement by the Assistant District Attorney General:

> The state quite agrees that other than his having been in the hall—in the hall, or in the room that is the proof against Mr. Mathis.

After noting that "[i]t's close, there is no question about it; it's very close," the Trial Judge elected to take the motion under advisement and hear the entire case before making a final ruling. There is no authority in our practice or procedure in a criminal case for the trial judge to take under advisement a motion for a judgment of acquittal made at the *conclusion of all the State's proof.* Rule 29(a), Tenn.R. Crim.P., clearly directs "the entry of judgment of acquittal . . . if the evidence is insufficient to sustain a conviction . . ." It is only when a motion for acquittal is made "at the close of *all* the evidence" that the trial judge "may reserve decision on the motion, submit the case to the jury and decide the motion" either before or after jury or its discharge without having returned a verdict. *See* Rule 29(b). When the evidence is insufficient to support a conviction "the trial judge has no alternative but to direct a verdict of acquittal." *Overturf v. State,* 571 S.W.2d 837, 839 (Tenn.1978).

Thus, the Trial Judge was in error. Petitioner's counsel, however, did not pursue the matter in accordance with approved practice. When the court overrules, or does not act, upon a motion for an acquittal made at the conclusion of the State's proof,

if counsel is convinced as to the validity of the motion, he or she must then and there take affirmative action to confine the controversy to the proof already presented. He or she should announce that the defendant stands on his motion, will present no proof, disclaims any benefit of any evidence introduced by his defendant, disavows any detriment, and should state that the evidence presented by the co-defendant will not be binding upon him, and he should participate no further in the trial until after the conclusion of all the proof. *See Caruthers' History of a Lawsuit* § 361 (8th ed. 1963). *See also Pikeville Fuel Co. v. Marsh,* 34 Tenn.App. 82, 232 S.W.2d 789 (1948).

Petitioner did not stand on his motion. In fact he made no objection to the action of the court and it was only after his co-defendant, Kimmons, had testified and closed that he announced that "Mr. Mathis rests." This was after he had cross-examined Kimmons. The cross-examination was extremely brief but by it he received a favorable response to the critical issue of whether petitioner handed Kimmons a gun. By failure to close his case at the conclusion of the State's proof and by participating in the trial by the cross-examination of his co-defendant, petitioner waived the error in the action of the court on his motion for an acquittal.[2]

#### d. *The Testimony of Kimmons*

The only defense proof was the testimony of Kimmons. Most of it, of course, was directed at his own insistence of self-defense. We examine it only to the extent necessary to determine whether it is sufficient to make out a case against petitioner, whose conviction must rest solely upon the testimony of Kimmons, together with any corroboration thereof.[3]

His version of the facts preceding the actual shooting is not essentially different from that expressed by the State's witness-

**2.** The Trial Judge overruled the motion for a directed verdict at the conclusion of all the proof.

**3.** Petitioner called no proof.

es. He says that about the time Farmer hit him and knocked him back against the tree, petitioner drove up. The fight continued and "*somebody*, you know, give me a pistol."

Subsequently, the following question was asked and answer given:

Q. Bobby, do you know who gave you that gun out there that night?

A. From what—*James Mathis was the only person behind me at the time. I don't know if he give me the pistol.* When I came back to Memphis, I asked *Mr. Williams, I said, Man, did you give me the pistol.* He said, no, I didn't give you the pistol. He said, didn't nobody get out of the car, but James Mathis you know. And, earlier before when we was fighting, when Mr. Shine was rushing me, I had turned and looked. I heard Mr. Mathis say, come on man, you know, like this here, you know. *But, he had to be the only person behind me to give me the pistol.* (Emphasis supplied).

On cross-examination the following testimony is pertinent:

Q. Mr. Kimmons, let me ask you this, sir. Did you see who actually gave you the pistol?

A. No, sir.

Q. So, you don't know who gave you the pistol; is that correct?

A. No, sir, not really.

Variations of this testimony appear in the record; however, Kimmons consistently stated that someone handed him the pistol from behind him and that only petitioner was in this position.

There is no corroborative testimony in the record. To the contrary, the clear preponderance of the proof is contrary to the Kimmons version. In fact, all witnesses clearly refute the Kimmons version. It is of importance to note that the pistol used by Kimmons in the slaying was never discovered, nor was there any effort made to trace its ownership to the petitioner.

## II.

### *Corroboration of the Testimony of an Accomplice*

As a matter of law, Kimmons, the perpetrator or principal was an accomplice of petitioner. *Boaz v. State,* 537 S.W.2d 716 (Tenn.Crim.App.1976).

The Trial Judge correctly charged the jury that a conviction may not be based upon the testimony of an accomplice "unless there is evidence in the case independent of his testimony corroborating his testimony, which independent evidence tends to show the commission of the offense charged and that the defendant committed the offense." Further, the Trial Judge correctly instructed that the corroboration is sufficient "if . . . without the aid of the accomplice's testimony, [it] tends to show the commission of the offense charged and the connection of the defendant with the offense." *See* T.P.I.—Crim. 37.09.

The corroboration in this case may not rest upon mere presence and opportunity; it must extend to the involvement of the petitioner as a participant, aider or abettor, in furnishing Kimmons with the gun. Without the testimony of Kimmons, the record is devoid of any proof that even points the finger of suspicion at petitioner. Therefore, there was no corroboration.

Without the testimony of Kimmons there is no independent evidence which fairly and legitimately tends to connect petitioner with the crime. He left the initial argument between Kimmons and the deceased, saying that it "wasn't about nothing." He went home and later returned. Why, the record does not reveal. The purpose may have been criminal or wholly innocent. We can only speculate. We can only speculate that he owned a gun and if so that it was the murder weapon. Aside from Kimmons' uncorroborated testimony, the record clearly and conclusively shows that petitioner did not hand Kimmons a gun. Phrasing it another way, no witness, except Kimmons, even suggests that petitioner was present, aiding and abetting by handing petition a gun or otherwise. "A verdict of a jury may

not be based alone upon conjecture, guess, speculation or a mere possibility." *Sullivan v. State*, 513 S.W.2d 152, 154 (Tenn.Crim. App.1974).

■ "[T]here must be some fact testified to, *entirely independent of the accomplice's testimony* which, *taken by itself*, leads to an inference, not only that a crime has been committed, but also that the *accused is implicated* in the crime." (Emphasis supplied). *McKinney v. State*, 552 S.W.2d 787, 789 (Tenn.Crim.App.1977).

The testimony in this case fails the test. There was no corroboration.

Reversed and dismissed.

BROCK, C. J., and FONES, COOPER and HARBISON, JJ., concur.