IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 1, 2012

## STATE OF TENNESSEE v. STEVE WILLIAM POLLOCK

**Appeal from the Circuit Court for Obion County**
**No. CC-10-CR-93      William B. Acree, Jr., Judge**

---

**No. W2011-01566-CCA-R3-CD  - Filed September 17, 2012**

---

The Defendant-Appellant, Steve William Pollock, appeals his two convictions for vehicular assault in the Obion County Circuit Court.  On appeal, Pollock argues:  (1) that the trial court erred in allowing the State's expert to rely on a study, a copy of which he was not provided, in forming her opinion regarding the likelihood of his intoxication at the time of the collision and (2) that the trial court erred in denying his motion for judgment of acquittal at the close of the State's proof and that the evidence was insufficient to support his convictions.  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

Charles S. Kelly, Sr. (on appeal), Dyersburg, Tennessee, and James T. Powell (at trial), Union City, Tennessee, for the Defendant-Appellant, Steve William Pollock.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Thomas A. Thomas, District Attorney General; and Kevin D. McAlpin, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

This case concerns a November 4, 2009 collision in which Pollock's truck hit an oncoming vehicle, resulting in serious injuries to the victims, Sarah and Scotty Jones. Pollock was later charged with two counts of vehicular assault.  Just prior to the presentation of proof at trial, the parties stipulated that Pollock caused serious bodily injury to the victims by the operation of a motor vehicle.  See T.C.A. § 39-13-106(a).  Therefore, it was the jury's

responsibility to determine whether Pollock's intoxication recklessly caused the victims' serious bodily injuries. See id.

**State's proof.** Sarah Jones testified that she and her sixteen-year-old son, Scotty Jones, were involved in an automobile collision with Pollock on November 4, 2009. She said that she was driving to Samburg on Highway 21, a two-lane road, when the collision occurred. However, she did not remember any details regarding the collision. Her injuries included a full hip replacement and whiplash.

Scotty Jones testified that the collision occurred when Pollock attempted to pass a van in front of him and drove into the lane for oncoming traffic. He said that his mother "tried to get over" on the shoulder of the road but that Pollock's vehicle hit them in a head-on collision. Scotty stated that his injuries included a titanium rod in his left leg and some cuts on his face and behind one of his ears, which resulted in scars. Both he and his mother were airlifted to the Regional Medical Center at Memphis because of the severity of their injuries.

Tina Thompson testified that she was a passenger in the front seat of the van that Pollock attempted to pass just before causing the collision on November 4, 2009. She said that the van she was riding in had just passed the top of a hill when Pollock's truck "pass[ed them] on a double yellow line" just before hitting the victims' truck. Thompson stated that the accident occurred "right beside" the van in the left lane and that "the impact was so great" she initially thought the van had been involved in the collision.

Jessie Clark testified that he witnessed the November 4, 2009 collision. He had been driving behind Pollock for five to seven minutes prior to the collision and, during that time, Pollock "kept swerving off the road, across the median, off the shoulder." He described Pollock's driving as "very, very erratic[.]" As he picked up his cell phone to call the police about Pollock's driving, he saw Pollock's truck collide with the victims' truck. Pollock drove "off of the shoulder" on the right side and then "overcorrected" before "smash[ing] right into [the victims' truck]." Clark did not recall a van in front of Pollock at the time of the collision. When Clark approached the truck that caused the collision, he saw blood on Pollock's face.

Sergeant Carl Jones, an officer with the Tennessee Highway Patrol, testified that he responded to the November 4, 2009 collision on Highway 21. When he arrived at the scene of the head-on collision, he saw rescue personnel removing an individual from a red and silver truck and saw another individual, later identified as Pollock, sitting in the driver's seat of a white truck. Sergeant Jones asked Pollock if he was okay, and Pollock responded affirmatively. He then asked Pollock what happened, and Pollock "began cursing [and] saying that the other pickup truck ran over him in his lane." During this conversation,

Sergeant Jones observed that Pollock's "speech was extremely slurred[,]" "[h]is eyes were droopy, and he had a drowsy appearance about him." He also said that Pollock's "reactions were very slow," and "[h]e had the appearance of a person being under the influence of an intoxicant." Then Sergeant Jones asked Pollock if he had been taking any medication, and Pollock said he had not. No field sobriety tests were conducted on Pollock because he was injured in the collision.

Sergeant Jones said that the physical evidence indicated that Pollock had been "traveling eastbound on [Highway] 21" when he "traveled across the center line into the westbound lane, striking the red and silver pickup truck head-on, directly in the westbound lane." The skid marks from Pollock's truck indicated that Pollock was either "attempting to . . . pass another eastbound vehicle, or [was] trying to avoid rear[-]ending another eastbound vehicle[.]" Sergeant Jones said that he did not "see any evidence of [Pollock] running off the [eastbound] shoulder" because "[t]he skid marks [caused by his braking began] just inside the eastbound lane, near the center line, and continued across into the westbound lane[.]" Based on the physical evidence, Sergeant Jones opined that Pollock "came up behind the van too fast, and instead of rear[-]ending the van, he attempted to go around it and pass, illegally, instead of swerving off the right side of the road[.]" He said that the victims had driven their truck almost completely onto the westbound shoulder just prior to the collision.

Sergeant Jones said that he later had contact with Pollock at the emergency room in Union City. During Pollock's interview with Agent Moore and Trooper Avery, Sergeant Jones noticed that Pollock's "speech was still extremely slurred" and "[h]is reactions were real[ly] slow." Shortly after the interview, Pollock refused medical treatment and asked to leave the hospital. When Pollock stood up, he was "unsteady on his feet and staggering about." Sergeant Jones opined that Pollock "was definitely a threat to himself and to any of the other motorists on the road" and "shouldn't have been driving that day."

On cross-examination, Sergeant Jones acknowledged that Pollock's air bag deployed as a result of the collision. However, he did not notice whether Pollock had blood on his face after the collision. Sergeant Jones admitted that the skid marks on the center line could have been caused by Pollock braking when he saw the oncoming truck as he was attempting to pass the van in front of him.

On redirect examination, Sergeant Jones concluded that Pollock was impaired rather than just temporarily shaken from the accident because Pollock's condition remained the same for two hours following the collision. He opined, based on his experience and Pollock's demeanor following the accident, that Pollock "appeared to be under the influence of an intoxicant."

Brian Avery, a trooper with the Tennessee Highway Patrol, testified that he responded to the November 4, 2009 collision. Trooper Avery observed a red and silver truck on the north side of the road and a white truck "sitting crossways [sic] in the roadway [with] the front of the vehicle . . . in the westbound lane." He immediately approached Pollock, who was sitting in the white truck, and began talking with him. When he asked Pollock what happened, Pollock responded, "She hit me in my lane." Trooper Avery noticed that Pollock's speech was slurred. He then asked Pollock if he had taken any medication or was under the influence of alcohol, and Pollock said that he had taken Methadone that day. Trooper Avery said that Pollock had no visible injuries at the time he was loaded into an ambulance.

Trooper Avery followed the ambulance to the hospital so that he could obtain a blood sample from Pollock. He later informed Pollock that he would have to provide a blood sample because a suspect's blood may be taken without consent in vehicular assault cases. Pollock became "a little combative" and informed him that "he wasn't going to give [his blood] to [him]." A nurse at the hospital drew Pollock's blood in Trooper Avery's presence. During Trooper Avery's testimony at trial, the parties stipulated that the sample obtained at the hospital was Pollock's blood, which was then sent to the Tennessee Bureau of Investigation for analysis. At the hospital, Trooper Avery observed Pollock's "slurred speech" and "his unsteadiness on his feet[.]" He opined that Pollock "was too impaired to operate a motor vehicle." Pollock refused medical treatment before leaving the hospital.

On cross-examination, Trooper Avery said that he did not see any blood on Pollock's face after the accident. He stated that Pollock's air bag deployed but that Pollock was not wearing his seat belt when he first observed him at the scene. Trooper Avery acknowledged that Pollock could have refused medical treatment at the hospital because he did not have health insurance. He further acknowledged that he and Agent Moore asked Pollock fifteen pages of questions, which included requests for Pollock to provide several telephone numbers and his social security number, and that Pollock answered each question. During this questioning, Pollock admitted that he had taken Methadone, a legal prescription drug, the day of the collision. Trooper Avery admitted that the skid marks on the yellow line could have been caused by Pollock hitting his brakes when he saw the oncoming truck as he was attempting to pass the van in front of him.

On redirect examination, Trooper Avery stated that Pollock was combative with him and insulted him on several occasions during the investigation. He also recalled Agent Moore having to ask the same question to Pollock several times and Pollock saying that he was having trouble understanding the question.

Dan Moore, the assistant special agent for West Tennessee's Criminal Investigations Division of the Tennessee Highway Patrol, testified that he investigated the November 4,

-4-

2009 accident. Agent Moore interviewed Pollock at the hospital in the presence of Sergeant Jones and Trooper Avery. During the interview, Pollock admitted that he had taken 120 milligrams of Methadone that morning but denied taking any other medications. Agent Moore said that Pollock was cursing and combative, refused to follow the instructions of the hospital personnel, was "thick-tongued while speaking[,]" had "slurred and sometimes unintelligible" speech, and was, at times, hysterical. In addition, he said that Pollock "could not stand without any assistance, he could not dress himself without assistance, he was very unsteady [on] his feet, [and he] could not maintain balance." Agent Moore said that there was no evidence Pollock had received a head injury in the collision. He also said that the hospital staff never indicated that Pollock had suffered any type of head injury or trauma. Agent Moore opined that Pollock "appeared to be under the influence of a central nervous system depressant, based . . . upon [his] experience and training." He also opined that there was "no doubt" that Pollock was too impaired to drive.

On cross-examination, Agent Moore said that he did not arrest Pollock because he was not the case agent. He acknowledged that he allowed Pollock to leave the hospital with his family, even though Pollock could have driven a car while still impaired. He also acknowledged that Pollock was not charged with the offenses in this case until he was indicted by the grand jury, which was approximately three months after the collision. On redirect examination, Agent Moore said that it was "not an uncommon practice" for the Tennessee Highway Patrol to present cases like this to the grand jury.

Sergeant Jones, when he was recalled by the State, testified that even though he had wanted to arrest Pollock the day of the accident, a representative from the district attorney's office informed him not to charge Pollock with an offense until the blood results were obtained and the preliminary investigation was completed.

Dr. Tonya Horton, a forensic scientist and special agent with the Tennessee Bureau of Investigation, was declared an expert in the field of pharmaceutical science. When Dr. Horton tested the blood sample taken from Pollock, she determined that it contained the following controlled substances: Meprobamate, Carisoprodol, Methadone, Diazepam, Nordiazepam, and Alprazolam. She explained that the Meprobamate was "more than likely, the active metabolite formed from the Carisoprodol[.]" She said that as the body attempts to turn the Carisoprodol into "a form that it can eliminate more easily . . . the [M]eprobamate is formed [and it has] more of a sedative effect, whereas the Carisoprodol [or] Soma is a muscle relaxant." Because Meprobamate is also a drug on its own, Dr. Horton could not conclusively state whether Pollock had taken the Meprobamate and Soma separately or if the Meprobamate had formed from the Soma.

Dr. Horton determined that the amount of Meprobamate in the sample was within the therapeutic range for that drug. However, she determined that the amount of Carisoprodol or Soma in the sample was in an amount lower than the therapeutic range for that drug. Dr. Horton opined that the amount of Meprobamate and Carisoprodol in the sample could impair an individual because Meprobamate had "sedative effects" which would make operating a vehicle difficult. She also said that Methadone, an "analgesic pain reliever also used to help withdrawal symptoms from opiates[,]" could make an individual sleepy. She stated that even though the amount of Methadone in the sample was less than her lowest calibrator of 0.1 micrograms per mil[liliter], that amount could still be within the therapeutic range for that drug, which is 0.07 to 1.1 micrograms per mil[liliter]. Dr. Horton said that Diazepam, also known as Valium, is a "sedative, tranquilizer, [and] anti-anxiety medication." She also said that the Nordiazepam is "an active metabolite" made by the body when an individual takes Diazepam. Both the Diazepam and the Nordiazepam were present in amounts less than her lowest calibrator. Finally, Dr. Horton said that Alprazolam, or Xanax, causes "[s]luggishness, sedation, and sleepiness" in individuals. Dr. Horton reiterated that the blood sample showed that Pollock had taken the following four or five medications prior to the collision: Soma, Methadone, Valium, and Xanax, with the possibility that he separately took a dose of Meprobamate. When asked what effect these drugs would have on the body if they were present at the same time, Dr. Horton stated:

> Separately, all of these drugs have a warning about operation of a motor vehicle in their use, and also a warning about using it in combination with other medications. And all of these in the body at the same time could impair a person's ability to operate heavy machinery or a car, [and could cause a person to] be sleepy, sluggish . . . unable to walk, [and to have] poor coordination.

She also added that the presence of all these drugs at the same time in the body would cause slurred speech. Dr. Horton concluded that Pollock had taken the Soma and Xanax "within 24 to 36 hours" of the time that his blood sample was taken. However, she was unable to tell when Pollock had ingested the Methadone and Valium. Dr. Horton warned that the presence of a drug within the therapeutic range does not mean that an individual can safely operate a motor vehicle.

**Defense's Proof.** Pollock did not testify at trial. Casey Blakley, Pollock's fiance, testified that she saw Pollock at around 11:00 a.m. on November 4, 2009, when Pollock and their son picked her up from the hospital in Jackson, where she had been staying with Pollock's mother following his mother's total knee replacement surgery. When Pollock and their son arrived, Blakley did not notice anything unusual about Pollock. She said he was not slurring his words or stumbling. When Pollock drove her from Jackson to Hornbeak, Blakley

stated that nothing about Pollock's driving caused her to worry. Pollock dropped Blakley and their son off at his mother's house at around 1:00 p.m., which was approximately two to two-and-a-half hours prior to the collision in this case. Blakley said that following the accident, Pollock had a sling on one arm and some scratches and blood on his face. She also said that she had been dating Pollock for the last eight years and would know if he were so impaired that he should not drive. On cross-examination, Blakley acknowledged that she knew Pollock had taken Methadone the morning of the accident.

At the conclusion of the trial, the jury convicted Pollock of two counts of vehicular assault. The trial court sentenced Pollock as a Range II, multiple offender and imposed concurrent eight-year sentences in the Tennessee Department of Correction. Pollock filed a timely motion for new trial, which was denied. He then filed a timely notice of appeal.

## ANALYSIS

**I. Objection to "Logan Study."** Pollock argues that the trial court erred in overruling his objection to Dr. Tonya Horton's reliance on a study published in 2000 by Dr. Logan, which showed how the drugs Carisoprodol and Meprobamate impaired an individual's ability to drive. He claims that Dr. Horton should not have been allowed to rely on this study because he had no opportunity to review the study or cross-examine her about the study. He also claims that Dr. Horton's reliance on the Logan study prejudiced the jury and that Dr. Horton's "alleged facts were not tested for their trustworthiness" as required by Tennessee Rule of Evidence 703. The State responds that this issue is waived because Dr. Horton's testimony at trial was not based on the Logan study. We conclude that Pollock is not entitled to relief on this issue.

During a hearing outside the presence of the jury, the following exchange occurred:

The State:    Can you tell me anything about what [the amounts of the drugs found in Pollock's blood] might mean?

Dr. Horton:   The Carisoprodol amount, 2.8, is within or might be a little below the active therapeutic range. The [M]eprobamate is within the active range, but Logan published in a 2000 paper [with] the concentrations that I found for the [M]eprobamate and the Carisoprodol. It was indicative of – well, 21 driving subjects were studied, and it was found that these people did show impairment at these levels that I exhumed [from Pollock's blood].

-7-

During the defense's cross-examination of Dr. Horton during the jury-out hearing, the following interchange occurred:

Defense: Ms. Horton, you said something earlier about some study that was done sometime or another, and you're using that in your testimony today; is that correct?

Dr. Horton: Yes.

Defense: Where did that study come from?

Dr. Horton: Dr. Logan out of, I believe Washington State.

Defense: And when did that come out?

Dr. Horton: It was 2000.

Defense: You're using his findings –

Dr. Horton: Yes.

Defense: – to determine this, is that correct?

Dr. Horton: In part.

Defense: In a large part?

Dr. Horton: Not necessarily.

Defense: No, ma'am, that doesn't answer the question. I'm not trying to be rude. But are you using that [Logan study] as some kind of standard to use in your testimony today?

Dr. Horton: That [Logan study] only deals with one of the four drugs.

Defense: Which one?

Dr. Horton: The Carisoprodol/[M]eprobamate.

Later, during the jury-out cross-examination, the defense again asked Dr. Horton about the Logan study:

Defense:    Now, this study that you used to talk about impairment of these people, this theory that you have or this study that you got from this [Dr. Logan], did you bring that with you today?

Dr. Horton:  No.  I have a review article.

Defense:    So, there's no way that I can review that today, is there?

Dr. Horton:  You could look at the review article.

Defense:    Okay.  You didn't bring the [Logan] study with you, though?

Dr. Horton:  No.

During the jury-out hearing, defense counsel objected to Dr. Horton's reliance on the Logan study because he was not provided a copy of the study so that he could cross-examine her about it.  The trial court noted the defense's objection and stated, "If that were the only basis for her opinion, I probably would not allow this testimony."  The court added that it believed that Dr. Horton had formed her opinion based on her training, experience, and education.  The court said that it was "going to let her testify on that basis" and that it "did not understand that her whole opinion was based upon one study."  The trial court then overruled the defense's objection to Dr. Horton's reliance on the Logan study.

Here, the trial court determined that Dr. Horton formed her opinion based on several factors, only one of which was the Logan study.  Dr. Horton herself testified during the jury-out hearing that she only partially relied on the Logan study in forming her opinion and that the study related only to the controlled substances of Carisoprodol/Meprobamate.  Significantly, Dr. Horton did not mention the Logan study in the presence of the jury.

Tennessee Rule of Evidence 703 provides guidance regarding the proper bases for expert testimony:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing.  If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.  Facts or data that are otherwise

inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703 (emphasis added). "Generally speaking, the trial court is afforded broad discretion in resolving questions concerning the admissibility of expert testimony; in consequence, we will not overturn its ruling on appeal absent a finding that it abused its discretion." State v. Ferrell, 277 S.W.3d 372, 378 (Tenn. 2009) (citing State v. Copeland, 226 S.W.3d 287, 301 (Tenn. 2007); State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993)). In this case, the trial court questioned Dr. Horton extensively during the jury-out hearing. The court specifically asked the basis of her opinion regarding the combined effect of the drugs found in Pollock's blood had on a person's body. Dr. Hutton replied that she based her opinion on attendance at seminars, various courses on drug impairment and human behavior, and observing "DUI/drug stops[.]" Following the hearing, the court concluded that Dr. Horton was well qualified and testified as to the basis of her opinion, which was consistent with Rule 703. Defense counsel stipulated to Dr. Horton's qualification as an expert and limited his objection to the portion her testimony that was based upon the Logan report. The record shows that defense counsel had an opportunity to question Dr. Horton regarding the basis of her testimony and whether or not her testimony was trustworthy. Accordingly, we conclude that the trial court did not abuse its discretion in admitting Dr. Horton's testimony. Pollock is not entitled to relief on this issue.

**II. Denial of Motion for Judgment of Acquittal.** Pollock argues that the trial court erred in denying his motion for judgment of acquittal made at the close of the State's proof because he claims the State failed to prove beyond a reasonable doubt that he was intoxicated at the time of the collision. He also apparently argues that the evidence was insufficient to support his convictions. In response, the State argues that Pollock has waived the issue regarding his motion because he presented evidence after making his motion for judgment of acquittal at the close of the State's case-in-chief. Waiver notwithstanding, the State also contends that the evidence was sufficient to support Pollock's convictions for vehicular assault. We agree with the State.

Tennessee Rule of Criminal Procedure 29 provides, in pertinent part:

On defendant's motion or its own initiative, the court shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, presentment, or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

Tenn. R. Crim. P. 29(b). "This rule empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the state rests or at the conclusion of all the evidence." State v. James, 315 S.W.3d 440, 455 (Tenn. 2010) (citing Overturf v. State, 571 S.W.2d 837, 839 & n.2 (Tenn. 1978)). When a motion for judgment of acquittal is made, the trial court must favor the party opposing the motion with the strongest legitimate view of the evidence, including all reasonable inferences from the evidence, and cast aside any countervailing evidence. Id. (citing Hill v. State, 470 S.W.2d 853, 858 (Tenn. Crim. App. 1971)). In order to appeal a denial of a motion for judgment of acquittal at the close of the State's case-in-chief, a defendant must stand on the motion and decline to present any evidence. Mathis v. State, 590 S.W.2d 449, 453 (Tenn. 1979). If the defendant fails to stand on his motion, the issue is waived on appeal. Id.

Here, the trial court denied Pollock's motion for judgment of acquittal made at the close of the State's proof. Pollock then presented evidence in his case-in-chief. At the close of Pollock's proof, Pollock renewed his motion for judgment of acquittal, and the trial court again denied the motion. Because Pollock presented proof following the denial of his first motion for judgment of acquittal, he has waived his right to appeal the trial court's denial of his first motion. See Finch v. State, 226 S.W.3d 307, 317 (Tenn. 2007) (refusing to revisit the waiver rule established in Mathis); see also State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998) (holding that "[t]his court may not return to the midpoint of the trial and then order the trial court to direct a judgment of acquittal upon the basis of the record as it then existed." (citing State v. Thompson, 549 S.W.2d 943, 945 (Tenn. 1977))).

Because Pollock renewed his motion for judgment of acquittal at the end of all the proof, we note that "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies when determining the sufficiency of the evidence after a conviction." State v. Anderson, 880 S.W.2d 720, 726 (Tenn. Crim. App. 1994). To the extent that Pollock also challenges the sufficiency of the evidence supporting his convictions, we conclude that he is not entitled to relief.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact

of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

Pollock was convicted of two counts of vehicular assault. Tennessee Code Annotated section 39-13-106 defines this offense:

> A person commits vehicular assault who, as the proximate result of the person's intoxication as set forth in § 55-10-401, recklessly causes serious bodily injury to another person by the operation of a motor vehicle. For the purposes of this section, "intoxication" includes alcohol intoxication as defined by § 55-10-408, drug intoxication, or both.

T.C.A. § 39-13-106(a). Tennessee Code Annotated section 55-10-401 generally prohibits anyone from driving or being in physical control of a motor vehicle while "[u]nder the influence of any intoxicant, marijuana, narcotic drug, or drug producing stimulating effects on the central nervous system[.]" Id. § 55-10-401(a)(1) (2004).

Here, the parties stipulated that Pollock caused serious bodily injury to the victims in this case while operating a motor vehicle. Accordingly, the only issue submitted to the jury was whether Pollock's intoxication recklessly caused the victims' serious bodily injuries.

One of the victims, Scotty Jones, testified that Pollock drove into the lane for oncoming traffic and hit the truck driven by his mother in a head-on collision. Tina Thompson testified that Pollock attempted to pass her van on a double yellow line just before colliding with the victims' truck. Jessie Clark stated that he followed Pollock for several minutes prior to the collision and that Pollock repeatedly swerved and ran off the shoulder of the road. He also said that Pollock drove "off of the shoulder" of the road and then

"overcorrected" before running into the victims' truck. Sergeant Carl Jones, Trooper Brian Avery, and Agent Dan Moore all testified that Pollock exhibited signs of intoxication, which included slurred speech, a drowsy appearance, slowed reactions, unsteadiness on his feet, and combativeness. Pollock admitted to law enforcement that he had taken Methadone prior to the collision. Dr. Horton testified that Pollock had taken the following four or five medications prior to the collision: Soma, Methadone, Valium, and Xanax, with the possibility that he separately took a dose of Meprobamate. She testified that each of these medications "have a warning about operation of a motor vehicle in their use" and "a warning about using it in combination with other medications." In addition, Dr. Horton opined, "[A]ll of these [medications] in the body at the same time could impair a person's ability to operate heavy machinery or a car, [and could cause a person to] be sleepy, sluggish . . . unable to walk, [and to have] poor coordination." We conclude that the evidence was more than sufficient to establish that Pollock's intoxication recklessly caused the victims' serious bodily injuries in this case.

## CONCLUSION

The trial court did not err in allowing Dr. Horton to rely, in part, on the Logan study in forming her opinion in this case. In addition, Pollock waived his claim that the trial court erred in denying his motion for judgment of acquittal at the close of the State's proof, and the evidence was sufficient to support his convictions. The judgments of the trial court are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE

-13-