IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 23, 2014

## STATE OF TENNESSEE v. ELMER HERBERT SIMPSON

**Appeal from the Criminal Court for Hawkins County**
**No. 12CR3     John F. Dugger, Judge**

_____

**No. E2013-02336-CCA-R3-CD - Filed August 5, 2014**

_____

The defendant, Elmer Herbert Simpson, appeals his Hawkins County Criminal Court jury convictions of possession of a Schedule III drug with intent to deliver, *see* T.C.A. § 39-17-417(a)(4), (d)(1), and maintaining a dwelling where controlled substances are kept or sold, *see id.* § 53-11-401(a)(5), both Class D felonies. On appeal, the defendant challenges the sufficiency of the convicting evidence and the propriety of his effective three-year sentence. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER, J., and JOE H. WALKER, III, SP. J., joined.

John S. Anderson, Rogersville, Tennessee, for the appellant, Elmer Herbert Simpson.

Robert E. Cooper, Jr., Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; C. Berkeley Bell, Jr., District Attorney General; and Alex Pearson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

At trial, Hawkins County Sheriff's Department Detective Jeff Hilton testified that on March 20, 2011, he received a call to assist Lieutenant Chad Gillenwater in an investigation underway on Horton Lane[1] in Church Hill. Detective Hilton found Lieutenant Gillenwater talking with two individuals who were inside a parked vehicle. As a result of that conversation, the officers went to the front door of the trailer home nearby and knocked. The defendant came to the door, and the officers explained that they had received

_____
[1]The street was later referred to as "Hord Lane" in the transcript of the evidence.

information that "Loritabs" were being sold from the residence. Detective Hilton testified that the defendant denied the allegation and that the defendant consented to the officers' entering and searching the trailer. Detective Hilton found "Loritabs hidden in the freezer." The tablets were in bottles that bore no prescription labels.

The officers arrested the defendant and transported him to the jail. After being advised of his rights and signing a written waiver, the defendant provided a statement in which he admitted that Roy Junior Gibson called the defendant to inquire about purchasing Loritabs, that the defendant told Mr. Gibson that he had some Loritabs he would sell to Mr. Gibson, and that Mr. Gibson subsequently came to the defendant's home. In his statement, the defendant said that he gave Mr. Gibson four Loritabs and that Mr. Gibson started to go to his vehicle to get the purchase money from a passenger in Mr. Gibson's vehicle, but when Mr. Gibson opened the defendant's front door, he saw the blue lights of the sheriff's vehicles. Mr. Gibson then put the pills the defendant had given him in the defendant's freezer. The defendant said that five minutes later an officer knocked on his door. He admitted that he gave the officer permission to search his house. He further admitted that he had stolen the Loritabs from his sister. The defendant said that when he took the pills from his sister's house, he had no intent to sell them; rather, he said, Mr. Gibson talked him into selling some of them.

The tablets obtained from the defendant's freezer were sent to the Tennessee Bureau of Investigation ("TBI") for analysis. The defendant stipulated the admissibility of the analysis report which showed that the 15 tablets submitted contained dihydrocodeinone, a Schedule III controlled substance.

Elizabeth Goan testified that, on March 20, 2011, she and her husband-to-be went with Roy Gibson to the defendant's trailer in Church Hill to "pick up some pills." When they arrived, she and her husband-to-be waited in the vehicle while Mr. Gibson went into the trailer. While they waited, Lieutenant Gillenwater arrived, and Ms. Goan told him what was occurring at the time.

Hawkins County Sheriff's Department Lieutenant Chad Gillenwater testified that on March 20, 2011, he saw a "vehicle parked in the middle of the roadway on Hord (phonetic) Lane trailer park . . . with the headlights on." Lieutenant Gillenwater drove to the vehicle and found passengers but no driver inside. As a result of conversation with the passengers, he and Detective Hilton approached the defendant's residence, knocked, and were admitted into the residence by the defendant, who consented to the officers' searching the residence. Lieutenant Gillenwater saw Detective Hilton find and retrieve pill bottles from the defendant's freezer. Lieutenant Gillenwater testified that, after he and Detective Hilton took the defendant to the sheriff's office and obtained a waiver of rights from the defendant,

the defendant gave an oral statement which the lieutenant transcribed and the defendant signed.

On cross-examination, Lieutenant Gillenwater said he was unaware that the defendant had any difficulty reading and writing. The interview was not tape recorded.

TBI Special Agent Forensic Scientist Michael Bleakley testified that the 15 tablets he received for analysis from the Hawkins County Sheriff's Department in the defendant's case contained "Dihydrocodeinone, or Hydrocodone . . . Loritab is a brand name."

The State rested.

The defendant called as a witness on his behalf Loretta Brown who testified that she is the defendant's sister and that the Loritabs in question were originally hers before the defendant "come [sic] in and stole them." She said she was not at home when he stole the pills but that he called her later and told her "when [she] got some gas [she] could come back and get them."

The defendant testified that he took the pills from Ms. Brown but had no intent to sell them. He said he took the pills to medicate his pain from his 2010 ankle and back fractures.

The defendant denied giving consent for the officers to search his residence on March 20, 2011. He said he told them they could "walk through and look in plain sight." He denied making the statement that Detective Hilton read into evidence. He said he had difficulty reading and writing and was unable to read the statement. The defendant testified that he "did not say what's in that statement." He said he never had any intent to sell the drugs and that he told "Junior Gibson [he] was not selling them to nobody, that [he] was giving them back to [his] sister." The defendant denied that Detective Hilton came into his residence until after he was arrested, and he denied mentioning any money to the officers. He stated that he had the Loritabs on his kitchen counter, and after the arrival of the deputies was discovered, Mr. Gibson put the pills in the freezer.

The defendant admitted that Mr. Gibson had called him on March 20, 2011, and asked whether the defendant had any pills to sell. The defendant said he told Mr. Gibson that the only pills he had were his sister's and that he was returning them to her. The defendant said that he thought Mr. Gibson was bringing some people to his trailer who might offer to purchase the trailer, which was for sale. The defendant testified that, without his knowledge, Mr. Gibson, after seeing the officers outside, put the pills in the freezer. The

defendant said he did not know that Mr. Gibson had them in his possession and that Mr. Gibson must have taken them from the counter, adding, "[H]e's stole off me before." The defendant acknowledged that he signed a "form" after he was advised of his rights but denied making the statement entered into evidence, saying, "The only statement I give [sic] them I told them I was not selling no pills to nobody. I have not priced no pills because I don't have education and I don't do that garbage." The defendant said he signed the statement because the officer "told [him] to."

Roy Junior Gibson testified for the State in rebuttal. He denied that he had ever stolen from the defendant. He testified that when he went to the defendant's residence on March 20, 2011, they discussed the pills that the defendant had gotten from his sister and his niece, and the defendant went to his truck to retrieve the pills. The defendant asked Mr. Gibson whether "the people [Mr. Gibson] was with would buy them off of him." Mr. Gibson responded that the defendant would have to ask the people, and when Mr. Gibson started out the door of the trailer, he saw the police and informed the defendant of their presence. Mr. Gibson denied having or hiding the pills.

On cross-examination, Mr. Gibson testified that he went to the defendant's trailer because the defendant was a friend of his; Mr. Gibson intended to ask the defendant to allow him to stay the night at the trailer. Mr. Gibson said the defendant denied this request. Mr. Gibson said that, at first, he told the defendant that Mr. Gibson's passengers were interested in buying the defendant's trailer, which was for sale at the time. He stated that no one gave the defendant money and that the defendant did not give any pills to him.

On re-direct examination, Mr. Gibson admitted that the purpose in going to the defendant's residence was to get pills and that the defendant was aware of that. On re-cross examination, Mr. Gibson testified that the defendant had told him on the telephone "that he had some pills that he wanted to get rid of, that he needed some gas." Mr. Gibson stated that he did not remember whether he had told Lieutenant Gillenwater in advance that he would be at the defendant's trailer at a certain time.

The defendant took the stand again and denied conversing with Mr. Gibson about selling pills. He denied any intent to sell pills. On cross-examination, he branded Mr. Gibson "a liar. He's been a liar all his life."

*I. Sufficiency of the Evidence*

In the defendant's first issue, he challenges the sufficiency of the evidence. He includes in this issue a claim that the trial court erred by denying his motion for judgment of acquittal made following the close of the State's case-in-chief; however, he is procedurally

-4-

barred from framing the sufficiency issue in this manner. Following the close of the State's proof, the defendant moved for a judgment of acquittal which the trial court denied. The defendant then offered proof. In this situation, the defendant has waived his right to appeal the denial of this motion. *See State v. Mathis*, 590 S.W.2d 449, 453 (Tenn. 1979); *see also State v. Johnson*, 762 S.W.2d 110, 121 (Tenn. 1988); *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998). That being clarified, we now review the sufficiency of all the evidence presented in the case.

When an accused challenges the sufficiency of the evidence, the appellate court considers the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979), regardless whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence, *State v. Winters*, 137 S.W.3d 641, 654-55 (Tenn. Crim. App. 2003). Especially inimical to the defendant's claim is the well-rooted axiom that the appellate court neither re-weighs the evidence nor substitutes its inferences for those drawn by the trier of fact. *Winters,* 137 S.W.3d at 655. Also, the credibility of the witnesses, the weight and value of the evidence, and all other factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978). In reviewing the sufficiency of the evidence, the appellate court affords the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id*.

"It is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to . . . deliver . . . the controlled substance." T.C.A. § 39-17-417(a)(4). Additionally, "[i]t is unlawful for any person . . . [k]nowingly to keep or maintain any . . . dwelling, building, . . . [,] or other structure or place that is . . . used for keeping or selling [controlled substances]." T.C.A. § 53-11-401(a)(5).

In the present case, the defendant is much aggrieved that he was charged with and convicted of these two offenses. He maintained in his trial testimony that he did not intend to sell any controlled substances, and he vigorously challenged the credibility of the State's witnesses who contradicted this claim. As such, he put his case before the jury, but when the evidence believed by the jury is sufficient to establish the elements of the offenses, the appellate court may not disturb the jury's findings. Such is the case here.

The evidence as accredited by the jury established that the defendant acquired the pills – Schedule III controlled substances – by stealing them from his sister and that he proposed selling some of them to Mr. Gibson and/or his associates as a means of raising gas

money. Through this evidence, the Stated showed that the defendant knowingly (1) possessed the contraband with intent to deliver the same and (2) maintained a dwelling that is used for keeping or selling controlled substances. Thus, the evidence supports the convictions in this case.

## II. Sentence Length

In his next issue, the defendant challenges the concurrent three-year sentences imposed for both of his Class D felony convictions. He claims that the trial court erroneously enhanced the sentence in the absence of any prior felony convictions and that the court neglected to apply mitigating factors.

In the sentencing hearing, the defendant argued that his sentence should be mitigated because the "defendant's criminal conduct neither caused nor threatened serious bodily injury"; because "substantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense" based upon the defendant's serious prior injuries and the pain associated therewith; because the "defendant was motivated by a desire to provide necessities for" himself, based upon the defendant's having no gas for his vehicle and his possession of only four dollars at the time of his arrest; and because the "defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct," based upon the conviction offenses' being the defendant's only felony convictions; and because of the defendant's coronary illness. *See* T.C.A. § 40-35-113 (1), (3), (7), (11), (13).

The court recited and reviewed the principles of and considerations for sentencing. The court reviewed the presentence report; noted the defendant's prior convictions, including two for driving under the influence, two for passing worthless checks, and one for public intoxication; and found that the defendant's sentence should be enhanced because he had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range." *See id.* § 40-35-114(1). The court also applied as an enhancement factor that the defendant was a leader in the commission of the offense. *See id.* § 40-35-114(2). The trial court declined to apply any mitigating factors. The court's findings resulted in a mid-range sentence of three years on each count to be served in incarceration.

Our standard of review of the trial court's sentencing determinations in this case is whether the trial court abused its discretion, but we apply a "presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn.

-6-

2012).

Trial courts must still consider the principles of sentencing enumerated in Tennessee Code Annotated section 40-35-210(b), *see id.*, 380 S.W.3d at 698 n.33 (citing T.C.A. § 40-35-210(b)), and must, as required by statute, consider "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed," T.C.A. § 40-35-103(5). Despite the wide discretion afforded the trial court under the current Sentencing Act, trial courts are still required to "place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." *Bise* at 706 n.41 (citing T.C.A. § 40-35-210(e)).

In the present case in which the defendant is a Range I offender, the range of punishment for both convictions is not less than two years and not more than four years. T.C.A. § 40-35-112(a)(4).

The presumption of reasonableness holds in the present case. The court emphasized the sentencing principles and considerations. The enhancement factor for the defendant's previous history of criminal convictions or behavior alone justifies the one-year enhancement for both sentences.[2] Contrary to the defendant's claim, the use of factor (1) is not dependent upon the previous criminal history's being composed of felonies; misdemeanors may suffice. *State v. Carter*, 908 S.W.2d 410, 413 (Tenn. Crim. App. 1995). Nothing in the trial court's findings that led to its rejection of mitigating factors undercuts the presumption of reasonableness.

*III. Conclusion*

As a consequence of our review, we affirm the judgments of the trial court.

---

[2]The defendant did not challenge the applicability of factor (2), that the defendant was a leader in the commission of the offense "involving two (2) or more criminal actors," *see* T.C.A. § 40-35-114(2), and the parties did not brief the applicability of factor (2). We simply observe, without holding either way, that the "offense" being sanctioned was for "possession" and that the defendant was the only actor in possession of the contraband. As such, one may reasonably question whether this offense involved two or more criminal actors. The resolution of the issue is unnecessary because, under the current sentencing regime, "a trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision," *Bise*, 380 S.W.3d at 709, and as we have noted, the use of factor (1) amply undergirds the enhancement of the sentences to three years.

_____
JAMES CURWOOD WITT, JR, JUDGE