# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs September 5, 2012

## STATE OF TENNESSEE v. ANTOINE PERRIER

**Appeal from the Criminal Court for Shelby County**
**No. 10-07294     W. Mark Ward, Judge**

---

**No. W2011-02327-CCA-MR3-CD  -  Filed March 22, 2013**

---

The Defendant-Appellant, Antoine Perrier, was indicted by the Shelby County Grand Jury for attempted second degree murder in count 1, employing a firearm during the commission of a dangerous felony in count 2, and aggravated assault in counts 3 through 8. He was subsequently convicted of the lesser included offense of attempted voluntary manslaughter in count 1, employing a firearm during the commission of a dangerous felony in count 2, aggravated assault in counts 3 through 7, and the lesser included offense of assault in count 8. The trial court merged count three into count one before sentencing Perrier as a Range I, standard offender to four years in counts 1, five years in counts 4 through 7, and eleven months and twenty-nine days in count eight. The court also sentenced Perrier as a Range I, violent offender to a mandatory consecutive sentence of six years in count 2. See T.C.A. § 39-17-1324(e)(1), (h)(i) (2006). The court ordered counts 1 through 7 to be served consecutively to one another and ordered count 8 to be served concurrently with the other counts for an effective sentence of thirty years. On appeal, Perrier argues: (1) the evidence is insufficient to sustain his convictions for attempted voluntary manslaughter and employing a firearm during the commission of a dangerous felony; (2) the trial court erred in its instructions to the jury; and (3) the trial court abused its discretion in imposing consecutive sentencing. Upon review, we affirm the judgments of the trial court. However, we remand the case solely for the purpose of correcting a clerical error on the judgment for count 4.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JEFFREY S. BIVINS, JJ., joined.

Larry D. Sims, II, Memphis, Tennessee for the Defendant-Appellant, Antoine Perrier.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Betsy Wiseman, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**Trial.** Sadak Sharhan, the owner of the Miracles Mini Market, testified that he was working behind the cash register when eight-year-old Tommia Taylor ("victim"), the daughter of a customer, was shot in his store on the afternoon of February 13, 2010. Sharhan said that at the time he heard the shots fired, one of his employees had just finished making a sandwich for Teone Vasser, one of his regular customers, who had been waiting outside the store. He said three or four shots were fired during the incident. Sharhan said that at the time of the shooting, Teone Vasser was with his brother, Anthony Vasser,[1] who was also a regular customer. He said that he had never had any trouble with either of these men in the past. When Sharhan heard the gunshots, he immediately pressed the store's emergency button to summon the police. He stated that the victim was standing near the deli counter at the time the shots were fired. Sharhan did not see the person who fired the shots and did not hear anyone arguing prior to hearing the gunshots. He said that the shots came from outside the store because the shots shattered the glass on the store's door before striking the victim inside the store. Sharhan said he never saw anyone with a gun inside the store.

On cross-examination, Sharhan stated that he remembered seeing Perrier, the Defendant-Appellant, in his store the day of the shooting. He reiterated that he did not hear anyone arguing in his store the day of the shooting but acknowledged that he was standing behind bulletproof glass at the time.

Tameka Shields testified that she was inside Sharhan's store when her daughter, Tommia Taylor, was shot. Shields stated that as she was standing in line at the store, a young woman who was trying to buy beer left the store to retrieve her license from her car, and Perrier, who was with the woman, decided to buy the beer for her. Shields allowed Perrier to check out in front of her. Then a tall man, later identified as Teone Vasser, who was standing at the store's door, began to argue with Perrier. Shields said she was not paying very close attention to the argument between the two men because it "didn't seem that serious." She said she approached the cashier and saw Teone standing just inside the store's front door just before shots were fired "all over the place." Shields said that she heard four gunshots but never saw the gunman.

---

[1] For clarity, we will refer to Teone Vasser and Anthony Vasser by their first names.

On cross-examination, Shields said that she heard Perrier and Teone arguing but that she could not hear the subject of their argument. Shields stated that Perrier left the store and that Teone stood at the store's door holding it partially open as he continued to argue with Perrier. She said Teone "was kind of agitated" but did not appear to be seriously angry. A few seconds later, Shields heard the gunshots. She said that at the time that the shots were fired, her daughter was standing behind Teone, who was still standing at the store's door. Shields said that she never saw anyone with Teone and that Teone never left the store. In addition, she said she never saw Teone or Perrier with a gun. After the shooting, Teone had bullet holes in his clothes.

On re-direct examination, Shields said that she never saw Anthony inside the store the day of the shooting. She also said she never heard Teone mention a gun and never heard him threaten to use a gun the day of the shooting.

Tommia Taylor, the victim, testified that during the February 13, 2010 shooting, one bullet went through her hand and two other bullets grazed her stomach and leg. She said she was hospitalized for three days for her injuries. The victim said she remembered two men arguing the day of the shooting. She said the argument started inside the store and then continued outside. Shortly thereafter, she realized that she had been shot. The victim said she did not see who shot her and did not see anyone with a gun that day.

On cross-examination, the victim stated that one of the men arguing was tall and the other man had "short little dre[a]ds in his hair." She said that when the argument started, the tall man was standing next to the food and the man with the short dreadlocks was by the cash register. She could not determine the cause of their argument. The victim remembered both men exiting the store and continuing to argue.

Teone Vasser testified that he was getting a sandwich at the store with his brother Anthony Vasser and Anthony's son, Darrius Boykin, when the victim was shot. He admitted that he had two prior 1997 felony convictions for theft of property and aggravated robbery. Teone said he was waiting on his sandwich inside the store and Anthony was outside the store because he had already made his purchases. Teone first saw Perrier before he ordered his sandwich. Perrier was in front of him in line and was about to buy a beer, but he did not have his identification. Perrier's girlfriend offered to get his identification from the car, and when she re-entered the store, Anthony held the door open for her. Teone said that the girl had a "real big booty" and that he and his brother were ogling her. When Perrier saw Anthony staring at his girlfriend, he began talking to her about it and began cursing. Perrier and his girlfriend left the store and got into his girlfriend's green Blazer that was parked in front of the store's door. Perrier got into the Blazer and closed the passenger door.

Teone said he went to the store's door, opened it slightly, and asked his brother if he had said something to the girl because Perrier had been "acting real belligerent about somebody looking at his girl." At the time, Anthony was standing to Teone's right and Boykin was standing to his left just outside the door. Anthony denied saying anything to the girl and then "tapped" on the hood of the Blazer, which caused Perrier's girlfriend to stop the car. Perrier jumped out of the vehicle, stood with one leg inside the car, and one leg outside the car, and began "cursing" and "hollering." Teone, who was still standing in the doorway to the store, said that Anthony was not angry but that he was trying to find out why Perrier was so mad. Anthony asked Perrier why he was "talking crazy in the store." Teone said that Perrier and Anthony were arguing but asserted that they were not being loud. Teone said he checked on his sandwich inside the store, went back to the store's door, and saw that Anthony and Perrier were still arguing. Teone said that as he tried to get Anthony away from Perrier, Perrier began arguing with Teone. Teone told Perrier that he was not going to argue with him and did not have to explain anything to him. At the time, Perrier was standing right outside the Blazer with the passenger door open. Teone said that as he and Perrier continued to argue, Perrier pulled out a black, small caliber pistol from his pants and held it by his side. When Anthony told Perrier that "we don't play with pistols around here" and that "[w]e shoot folks around here," Perrier began firing his gun. At the time, Anthony was just outside the store's door and was standing right next to Teone, who was still standing in the store's doorway. Anthony pushed Teone back into the store and ran in one direction while Boykin ran in the other direction. Teone stated that the bullets from Perrier's gun went through the store's glass door and his own clothing before hitting the victim inside the store. Teone said he did not have a weapon the day of the shooting. He also said that Anthony and Boykin did not have weapons that day. Teone was unaware that Perrier had a gun until he began shooting. After firing the shots, Perrier jumped into the front passenger seat of the Blazer, and Perrier's girlfriend drove away. Later that day, Teone "[i]mmediately" identified Perrier as the shooter from a photo spread. He acknowledged that he had some marijuana in his possession at the time of the shooting, for which he was later convicted.

On cross-examination, Teone said he was not selling marijuana at the store the day of the shooting. He stated that Anthony had told Perrier that he had recently been released from prison and that he did not want any problems in an attempt "to calm the situation down." He also stated that Anthony backed away from Perrier after tapping on the hood of the Blazer.

Faith Taylor testified that she drove Perrier to get a beer at the store on February 13, 2010. When she left the store to get identification, Anthony became so distracted by her looks that he accidentally walked into the store's door. After Anthony exited the store, Taylor and Perrier laughed about Anthony running into the door. She said Perrier was not angry about Anthony ogling her. Taylor said Teone overheard Perrier telling another man

that if Anthony "was going to look that hard he could have said something." She said that Perrier did not know Anthony or Teone and did not know that they were brothers. She admitted that she had seen Anthony and Teone at her apartment complex but asserted that she did not know their names. Teone immediately told Anthony what Perrier had said about him.

Taylor said that she was about to crank her engine to leave when Anthony "flagged" them down and started saying something. Perrier opened his door and asked Anthony what he said. When Taylor realized that Perrier was getting out of her car, she tried to grab his shirttail in an attempt to stop him because she thought the argument was "getting a little bit more intense" and she "was a little worried [about] what might happen.." Taylor said that Perrier did not appear to be angry when he opened the car door and began talking with Anthony. She said Perrier stood just outside her Blazer with the door open before he began walking towards the three men. She said that they continued to argue, although she could not make out what they were saying to one another. Taylor said that at that point, Anthony and another man were outside the store's door, and Teone came outside and stood next to Anthony. When Anthony told Perrier that Teone had informed him about what Perrier had said about him, the argument "escalated." Then Teone told Perrier, "F[---] this N[ew] O[rleans] N[-----]." She said that approximately ten seconds after he got out of her car, Perrier pulled a black, scratched up gun from the back of his pants and immediately fired three or four shots. She said that Perrier pointed the gun at Teone at the time he fired the shots. Taylor said she did not know Perrier had a gun that day. She also said she had not seen Teone, Anthony, or Boykin with a weapon in the store, and she had not heard them mention a gun during the argument.

Taylor said that after Perrier fired the shots, he got back into her car and told her to drive away. She said that she left the scene because she was "terrified" that the three men might shoot at them and because she was afraid that Perrier would get mad at her if she did not do what he said. Taylor said she drove them to her apartment. When they got upstairs, Perrier removed the clip from his gun and ran downstairs. As she looked out the window, Taylor saw the police looking at her Blazer. Perrier came back upstairs, and she went downstairs to talk to the police. Taylor told the police that Perrier had fired shots at the store next door and that she had driven away from the scene. She also told them that Perrier was in her apartment. She said that the police did not enter her apartment until several hours later and were unable to find Perrier because he had escaped by climbing through her attic and into the attic of another apartment unit. The police later found Perrier's gun behind her refrigerator. She said the police arrested Perrier two or three months after the shooting.

On cross-examination, Taylor acknowledged that Anthony and Teone were threatening Perrier "in a way"because they were confronting him at the same time. She said

that Perrier did not get out of her car until Teone came out of the store and said, "F[---] this N[ew]O[rleans] N[-----]." At that point, Perrier fired the shots. She said that Anthony and Teone remained on the sidewalk in front of the store during the argument. She said that at the time of the shooting, she had been dating Perrier for a year and a half. She said that she had never known Perrier to be a violent person and that Perrier had never been violent with her.

On redirect examination, Taylor said she tried to get Perrier back inside her vehicle two different times, but he wanted to stay outside the vehicle so he could continue arguing with the men. On recross-examination, Taylor acknowledged that she would not have seen if Teone, Anthony, or Boykin reached for a gun because she was so focused on getting Perrier back inside her vehicle.

Ronald Weddel, an officer with the Memphis Police Department, investigated the February 13, 2010 shooting at the Miracles Mini Market. He stated that the police found one bullet fragment and three bullet casings, which indicated that at least three shots had been fired. Officer Weddel said that although the police were unable to initially find Perrier, the fugitive team arrested Perrier on June 26, 2010.

Perrier, the only witness for the defense, testified in his own behalf. He admitted that he had been convicted of felony theft approximately two years before this trial. Perrier stated that he went with Taylor to the Miracles Mini Market on February 13, 2010, to purchase a beer. Because Taylor had left her identification in the car, he decided to buy the beer for her. At the time, Perrier was standing in line behind a lady and her little girl, and the lady told him to pay ahead of her. Perrier said that when Taylor went outside to get her identification, Anthony was so distracted by her looks that he ran into the store's door. Upon Taylor's return to the store, he and Taylor began laughing about Anthony ogling her and running into the door. Perrier told Taylor, "[I]f [he] wanted to say something, he just could have said something to you, but I know how you look. You look pretty good. So I see what he was looking at." He said this conversation was overheard by Teone, although he did not know Teone or Anthony Vasser and did not know that they were brothers.

Perrier said he and Taylor exited the store and got into her Blazer. As Taylor was about to put the car in reverse, they were still laughing about Anthony running into the door at the store. Then Anthony, Teone, and Boykin "flagged" them down as they were about to leave. Perrier said that he opened the Blazer's door and said to Anthony, "What's up[?]" Anthony asked Perrier if he had anything to tell him, and Perrier said he had just been telling Taylor that Anthony should have said something to Taylor instead of just looking at her. Then Teone came out of the store and told Anthony that he did not have to explain anything to this "B[----] A[--] N[-----]." Perrier told Teone that he was being disrespectful, and Teone

replied that he did not "give a d[---]" because Perrier was not from around there. Perrier said that he and Anthony had resolved their issue before Teone came out of the store and began cursing at him. At that point, Anthony told Teone that he did not have time for this argument because he had just gotten released from prison. Teone said, "Man, f[---] the n[-----]. I don't give a f[---] about no n[------] like you. We shoot them." Perrier said that at that point, he was "on defense mode" and moved away from the vehicle to get away from Taylor in case the men started firing shots. Perrier said that he had a gun with him that day because he had gotten held up at gunpoint when he first came to the Memphis area and had made the decision to never let that happen again because he had two children. Perrier said that he had the gun in his jacket. Perrier told Teone, "What's up?" Teone cursed at him again and acted "like he was about to pull [out a gun] from his back pocket and that's when I shot him." Perrier asserted that he shot his gun in self-defense because he "feared that [Teone] was going to react with a gun." Perrier said, "I reacted. I shot and I left." He added, "I didn't just stay there and try to figure out what was going on because basically I didn't really understand what all this was about anyway." Perrier said that he initially got out of Taylor's Blazer because he wanted to see why Anthony flagged him down. He said that when Teone came out of the store and began cursing him, he became afraid.

Perrier said that he left the scene after firing the shots because he was "scared" and because he did not know what else to do. He said that he got really upset when he discovered that he had injured an eight-year-old little girl. Perrier said that he did not turn himself into the police because he knew he needed a lawyer but could not afford one and because he did not want to be represented by a public defender. When asked how he felt about what happened on February 13, 2010, he said, "If I could take it back, I would because look what I'm facing and this is not my M[odus] O[perandi]. I don't just go around doing stuff like this. I just don't[,] and if I [could] take it back, I would have a second thought about what I did"

On cross-examination, Perrier admitted that he never saw Anthony, Teone, or Boykin with a gun on February 13, 2010. He acknowledged that he knew that Sharhan, Shields, and Shield's daughter were inside the store when he fired his gun. He also acknowledged that he left the scene after shooting the eight-year-old victim and that he escaped from the police by crawling through the attic of Taylor's apartment into another unit. Perrier admitted that he hid from the police until he was arrested several months after the shooting.

After deliberating, the jury found Perrier guilty of attempted voluntary manslaughter, employing a firearm during the commission of a dangerous felony, four counts of aggravated assault, and one count of assault.

**Sentencing Hearing.** At the June 6, 2011 sentencing hearing, the State entered a copy of the presentence investigation report into evidence, and the defense presented testimony from Perrier. Perrier recounted his prior testimony at trial and apologized for his actions: "Yeah, I'm sorry and I take full responsibility [for] what happened. I didn't intend for that little girl to get hit. I reacted out of self-defense." He reiterated that Teone "reached like he was about to pull[] something out, out of his back. That what made me react the way I reacted." Perrier asked the court for leniency because he had a six-year-old son and a one-year-old daughter that he wanted to raise. Perrier also stated, "I'm just asking for a little sympathy. I'm not a bad person. It's not something I do everyday. I just got caught up in the situation[,] and I have to pay for what I did." On cross-examination, Perrier admitted that he never turned himself into the police, that he escaped from Taylor's apartment to avoid arrest, and that he hid for several months until he was arrested. Perrier also admitted that his actions could have killed a number of people in and around the store. Perrier acknowledged that he had been convicted of one felony in Tennessee. He admitted that he had been arrested in Louisiana but could not state the number of times he had been arrested there. The presentence investigation report showed that Perrier received misdemeanor convictions in Tennessee for simple assault and criminal impersonation on June 28, 2010. The report also showed that the last time Perrier had worked was in 2008 when he was a truck driver for the Louisiana Seafood & Exchange for a period of two months.

Perrier admitted that he had been convicted of felony theft in Shelby County on May 26, 2009, and that he had been placed on probation for two years for that conviction. He also admitted that he was charged with the offenses in this case while he was on probation for his theft conviction. Perrier acknowledged that he was carrying a concealed gun while he was on probation for his theft conviction, which violated federal and state law. He also acknowledged that he violated the law by regularly smoking marijuana.

Regarding the mitigating factor that Perrier acted under strong provocation, the trial court acknowledged that the jury found some form of provocation because it convicted Perrier of the lesser included offense of attempted voluntary manslaughter rather than attempted second degree murder. The court stated that it did not believe Perrier acted under strong provocation but said that it would "give it what weight it deserves, which is not much." See id. § 40-35-114(2) (2006). The court gave great weight to the enhancement factors that Perrier had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range" and that Perrier had "failed to comply with the conditions of a sentence involving release into the community" because he committed the offenses in this case while on probation for his prior felony theft conviction. Id. § 40-35-114(1), (8) (2006).

At the conclusion of the hearing, the trial court merged count three into count one before sentencing Perrier as a Range I, standard offender to four years in counts 1, five years in counts 4 through 7, and eleven months and twenty-nine days in count eight. The court also sentenced Perrier as a Range I, violent offender to a mandatory consecutive sentence of six years in count 2. See id. § 39-17-1324(e)(1), (h)(i). Regarding the issue of consecutive sentencing, the court determined that Perrier was "a dangerous offender whose behavior indicate[d] little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Id. § 40-35-115(b)(4) (2006). The court held that "the circumstances surrounding the commission of this offense [were] aggravated" because Perrier fired multiple shots into a convenience store in which several people were present. In addition, it held that "confinement for an extended period of time [was] necessary to protect society[,]" given Perrier's "unwillingness to lead a productive life" and his decision "to resort to criminal activity in furtherance of an anti[-]societal lifestyle." The court ordered counts 1 through 7 to be served consecutively to one another and ordered count 8 to be served concurrently with the other counts, for an effective sentence of thirty years. The court determined that the length of Perrier's sentences was "reasonable related to the offense[s]" for which Perrier was convicted.

Perrier filed an untimely motion for new trial on July 12, 2011, thirty-six days after entry of his judgments on June 6, 2011. On July 18, 2011, the trial court denied the motion for new trial. On October 31, 2011, Perrier filed a motion in this court to waive the timely filing of his notice of appeal. On November 18, 2011, this court determined that it was in the interest of justice to waive the timely filing of the notice of appeal and gave Perrier ten days to file a notice of appeal document. On November 28, 2011, Perrier filed a notice of appeal in this case.

## ANALYSIS

**I. Sufficiency of the Evidence.** Perrier argues that the trial court erred in denying his motion for judgment of acquittal and motion for new trial and contends that the evidence was insufficient to support his conviction for attempted voluntary manslaughter because he lacked the intent to kill Anthony Vasser at the time he fired his gun. First, Perrier argues the evidence showed that the "antagonistic discussions" between Anthony Vasser and him "had ceased" at the time he fired his gun. Second, he argues the evidence showed that his intended target was Teone Vasser, not Anthony Vasser. Perrier also argues that the evidence was insufficient to sustain his conviction for employing a firearm during the commission of a dangerous felony because this conviction depended on his conviction for attempted voluntary manslaughter. See id. § 39-17-1324(b), (i)(1).

-9-

The State responds that Perrier has waived this issue because he failed to provide citations to the record on appeal. In addition, the State argues that the evidence is sufficient to sustain the convictions. We agree that the evidence is sufficient to sustain Perrier's convictions for attempted voluntary manslaughter and employing a firearm during the commission of a dangerous felony.

We agree that Perrier failed to provide citations to the appellate record in the argument section of his brief. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). Failure to comply with this basic rule will ordinarily constitute a waiver of the issue. State v. Hammons, 737 S.W.2d 549, 552 (Tenn. Crim. App. 1987). In addition, Tennessee Rule of Appellate Procedure 27 states that an appellant's brief must contain an argument containing citations to authorities and references to the record. Tenn. R. App. P. 27(a). Because Perrier included some citations to the record in his Statement of the Facts in his brief, we will nevertheless address his issues on appeal. However, because Perrier failed to file a timely motion for new trial, we will not address his claim that the trial court erred in denying his motion for new trial.

Tennessee Rule of Criminal Procedure 29 provides, in pertinent part:

> On defendant's motion or its own initiative, the court shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, presentment, or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

Tenn. R. Crim. P. 29(b).

"This rule empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the state rests or at the conclusion of all the evidence." State v. James, 315 S.W.3d 440, 455 (Tenn. 2010) (citing Overturf v. State, 571 S.W.2d 837, 839 & n.2 (Tenn. 1978)). When a motion for judgment of acquittal is made, the trial court must favor the party opposing the motion with the strongest legitimate view of the evidence, including all reasonable inferences from the evidence, and cast aside any countervailing evidence. Id. (citing Hill v. State, 470 S.W.2d 853, 858 (Tenn. Crim. App. 1971)). In order to appeal a denial of a motion for judgment of acquittal at the close of the State's case-in-chief, a defendant must stand on the motion and decline to present any evidence. Mathis v. State, 590 S.W.2d 449, 453 (Tenn. 1979). If the defendant fails to stand on his motion, the issue is waived on appeal. Id. Because Perrier presented proof following the denial of his first motion for judgment of acquittal, he has waived his right to appeal the trial court's denial of his first motion. See Finch v. State, 226

S.W.3d 307, 317 (Tenn. 2007) (refusing to revisit the waiver rule established in Mathis); see also State v. Ball, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998) (holding that "[t]his court may not return to the midpoint of the trial and then order the trial court to direct a judgment of acquittal upon the basis of the record as it then existed." (citing State v. Thompson, 549 S.W.2d 943, 945 (Tenn. 1977))).

Here, Perrier renewed his motion for judgment of acquittal as to the attempted second degree murder charge in count 1 after he presented his proof. He again argued that there was no evidence showing that he attempted to kill Anthony Vasser. In denying the motion, the court noted that Anthony and Teone Vasser were standing next to each other at the time the shots were fired and stated that it was going to let the jury resolve whether Perrier intended to shoot Anthony or Teone.

We recognize that "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction[.]" State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000); Ball, 973 S.W.2d at 292; State v. Blanton, 926 S.W.2d 953, 957-58 (Tenn. Crim. App. 1996). Because the standard of review is the same for Perrier's claims that the trial court erred in denying his motion for judgment of acquittal and that the evidence was insufficient to sustain the convictions, we will analyze both of these issues at the same time.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Henley v. State, 960

-11-

S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." Bland, 958 S.W.2d at 659. A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

Perrier was convicted of the lesser included offense of attempted voluntary manslaughter of Anthony Vasser. Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211(a) (2006). The offense of criminal attempt is defined as follows:

A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101(a) (2006).

Perrier argues that the evidence established that his argument with Anthony ended before he fired his gun and that his intended target was Teone not Anthony. Viewing the evidence in the light most favorable to the State, we conclude that a reasonable trier of fact could have found the essential elements of attempted voluntary manslaughter of Anthony Vasser beyond a reasonable doubt. The eight-year-old victim testified that the argument between Perrier and Teone began inside the store and continued outside, although she could not determine why they were arguing. In addition, Shields, the victim's mother, testified that Teone started the argument with Perrier inside the store. She stated that she did not pay attention to the argument because the argument "didn't seem that serious" and that she, too,

-12-

was unable to determine the cause of the argument. Neither of these witnesses testified about what occurred outside the store just before the shots were fired.

Teone testified that Perrier began to curse when he saw Anthony ogling Taylor. He also stated that Anthony stopped Perrier and Taylor from leaving the store and demanded to know why Perrier was "talking crazy in the store." Teone said that when Anthony told Perrier that "we don't play with pistols around here" and that "[w]e shoot folks around here," Perrier began firing his gun. Teone stated that Anthony was standing right next to him at the time that Perrier fired his gun.

Taylor also testified that Anthony stopped her and Perrier from leaving the store. She said that the argument "escalated" when Anthony said that Teone had told him what Perrier had said about him in the store. Taylor said that Perrier pulled a gun out approximately ten seconds after he got out of her Blazer and that Perrier's gun was pointed at Teone when he fired the shots. However, she said that Anthony and Teone were standing on the sidewalk in front of the store at the time Perrier fired his gun.

Perrier was the only witness to testify that he and Anthony had resolved their disagreement at the time that Teone came outside the store. In addition, he was the only witness to claim that Teone, not Anthony, made the comment about shooting people like him before he opened fire. Although several different versions of the shooting were presented at trial, it was the jury's duty to evaluate the credibility of witnesses, to determine the weight given to testimony, and to resolve all conflicts in the evidence. See Odom, 928 S.W.2d at 23. For this reason, we will not "reweigh or reevaluate the evidence." Henley, 960 S.W.2d at 578-79. Accordingly, we conclude that the trial court did not err in denying the motion for judgment of acquittal at the close of the defense's proof. We also conclude that the evidence is sufficient to sustain Perrier's conviction for attempted voluntary manslaughter of Anthony Vasser. Consequently, the conviction for employing a firearm during the commission of a dangerous felony is also sustained.

**II. Jury Instruction.** Perrier argues that the trial court erred in instructing the jury regarding the lesser included offense of attempted voluntary manslaughter because the evidence at trial failed to show that he intended to shoot Anthony Vasser, the victim in the indictment, at the time he fired his gun. He contends that the trial court erred instructing the jury regarding the offense of felon in possession of a weapon because he was not indicted for this offense. He contends that the instruction regarding felon in possession of a weapon was prejudicial because it "allowed the jury to draw the inference that Mr. Perrier, a convicted felon (for theft) was acting in an unlawful manner at the time he fired the gun, rather than acting to protect himself from possible harm" and that he "had a propensity for carrying weapons." The State responds that Perrier has waived all issues regarding jury

-13-

instructions because he filed an untimely motion for new trial. We agree that Perrier has waived these issues.

Tennessee Rule of Criminal Procedure 33(b) states, "A motion for a new trial shall be in writing or, if made orally in open court, be reduced to writing, within thirty days of the date the order of sentence is entered." Tenn. R. Crim. P. 33(b). The Tennessee Supreme Court emphasized the strict thirty-day deadline in this rule:

> [Rule 33(b)] is mandatory, and the time for the filing cannot be extended. Tenn. R. Crim. P. 45(b). A trial judge does not have jurisdiction to hear and determine the merits of a motion for a new trial that has not been timely filed. State v. Dodson, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989); State v. Givhan, 616 S.W.2d 612, 613 (Tenn. Crim. App. 1981); Massey v. State, 592 S.W.2d 333, 334-35 (Tenn. Crim. App. 1979). The trial judge's erroneous consideration of ruling on a motion for new trial not timely filed, as in this case, does not validate the motion. Dodson, 780 S.W.2d at 780.
>
> Failure to file a written motion for new trial within the required thirty days not only results in the appellant losing the right to have a hearing on the motion, but it also deprives the appellant of the opportunity to argue on appeal any issues that were or should have been presented in the motion for new trial. Dodson, 780 S.W.2d at 780; Givhan, 616 S.W.2d at 613; Massey, 592 S.W.2d at 333.

State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997). Here, Perrier filed his motion for new trial on July 12, 2011, thirty-six days after entry of his judgments on June 6, 2011. Consequently, Perrier has waived all issues for appellate review other than the sufficiency of the evidence and sentencing. See Tenn. R. App. P. 3(e); State v. Bough, 152 S.W.3d 453, 460 (Tenn. 2004) (citing Martin, 940 S.W.2d at 569). Moreover, we conclude that the trial court's jury instructions regarding attempted voluntary manslaughter and felon in possession of a weapon do not rise to the level of "plain error." See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."); State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (establishing the five factors that should be considered by this court when determining whether an error is "plain error.").

**III. Sentencing.** Perrier argues that the trial court abused its discretion in imposing consecutive sentencing. Specifically, he claims that the trial court erred in determining that he was a dangerous offender. He asserts that the proof at trial and at the sentencing hearing

showed that he did not normally fire weapons, that he acted in self-defense, and that he was sorry for harming the eight-year-old victim. Consequently, he argues that the sentence he received was unduly harsh. The State responds that the record fully supports the trial court's imposition of consecutive sentencing. We agree with the State.

Where a defendant is convicted of one or more offenses, the trial court generally has discretion to decide whether the sentences shall be served concurrently or consecutively. T.C.A. § 40-35-115(a), (b) (2006); see State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012) (This court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act."). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of seven categories enumerated in code section 40-35-115(b). Those categories include:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b) (2006). An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense." Id. § 40-35-102(1) (2006). In addition, the length of a consecutive sentence must be "no greater than that deserved for the offense committed." Id. § 40-35-103(2) (2006).

Here, the court determined that Perrier was a dangerous offender. See id. § 40-35-115(b)(4). Although Perrier argues that the trial court erred in determining that he was a dangerous offender, we conclude that the trial court properly applied this factor before imposing consecutive sentencing. Regarding this subsection, the Tennessee Supreme Court has stated:

"Proof that an offender's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender, but it may not be sufficient to sustain consecutive sentences. Every offender convicted of two or more dangerous crimes is not a dangerous offender subject to consecutive sentences; consequently, the provisions of [s]ection 40-35-115 cannot be read in isolation from the other provisions of the Act. The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender."

State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002) (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)) (emphasis added). Unlike the other six subsections, the trial court must make additional factual findings for the "dangerous offender" factor because it is "the most subjective and hardest to apply." Id. (quoting State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999)). Here, the court specifically held that "the circumstances surrounding the commission of this offense [were] aggravated" because Perrier fired multiple shots into a convenience store while several people were present and that "confinement for an extended period of time [was] necessary to protect society[,]" given Perrier's "unwillingness to lead a productive life" and his decision "to resort to criminal activity in furtherance of an anti[-]societal lifestyle." The court also determined that the length of Perrier's sentences was "reasonable related to the offense[s]" for which Perrier was convicted. The record shows that the trial court made the additional factual findings required of this factor. Moreover, we agree with the State that Perrier admitted he was charged with the offenses in this case while on probation for his felony theft conviction, which also provides a sufficient basis for the trial court to impose consecutive sentencing. See T.C.A. § 40-35-115(b)(6) (2006). Accordingly, we conclude that the trial court did not abuse its discretion in imposing consecutive sentencing in this case.

**CONCLUSION**

We affirm the trial court's judgments. However, we remand the case for the correction of the judgment in count 4 to reflect that the trial court ordered the sentence in count 4 to be served consecutively to the sentence in count 2.


_____
CAMILLE R. McMULLEN, JUDGE